GIBSON, DUNN & CRUTCHER LLP
James P. Fogelman, SBN 161584
    jfogelman@gibsondunn.com
Jay P. Srinivasan, SBN 181471
    jsrinivasan@gibsondunn.com
Shannon E. Mader, SBN 235271
    smader@gibsondunn.com
Marysa Lin, SBN 295429
    mdlin@gibsondunn.com
333 South Grand Ave.
Los Angeles, CA  90071-3197
Telephone:  (213) 229-7000
Facsimile:  (213) 229-7520

Attorneys for Plaintiffs
P6 LA MF Holdings SPE, LLC, P6 LA MF
Holdings I LLC, Luxe Broadway, LLC, Luxe La
Cienega, LLC, Luxe Washington, LLC, 1410 5th
Street, LLC, Luxe 1420 5, LLC, Luxe 1440 5,
LLC, NMS Broadway, L.P., and Lincoln Walk
Studios, LP

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| P6 LA MF Holdings SPE, LLC, a limited liability company; P6 LA MF Holdings I LLC, a limited liability company; Luxe Broadway, LLC, a limited liability company; Luxe La Cienega, LLC, a limited liability company; Luxe Washington, LLC, a limited liability company; 1410 5th Street, LLC, a limited liability company; Luxe 1420 5, LLC, a limited liability company; Luxe 1440 5, LLC, a limited liability company; NMS Broadway, L.P., a limited partnership; and Lincoln Walk Studios, LP, a limited partnership, <br><br> Plaintiffs, <br><br> vs. <br><br> Neil Shekhter, as an individual and as Trustee of The NMS Family Living Trust dated September 3, 1991; Margot Shekhter, as an individual and as Trustee of The NMS Family Living Trust dated | CASE NO. 2:17-cv-00616 <br><br> **COMPLAINT FOR DAMAGES** |

September 3, 1991; NMS Properties, Inc.,
a corporation; NMS Capital Partners I,
LLC, a limited liability company; and
Does 1-10,

Defendants.

Plaintiffs P6 LA MF Holdings SPE, LLC ("AEW" or "Investor Member"), P6 LA MF Holdings I LLC ("Joint Venture"), Luxe Broadway, LLC, Luxe La Cienega, LLC, Luxe Washington, LLC, 1410 5th Street, LLC, Luxe 1420 5, LLC, Luxe 1440 5, LLC, NMS Broadway, L.P., and Lincoln Walk Studios, LP (collectively, "Plaintiffs"), by and through their counsel of record, Gibson, Dunn & Crutcher LLP ("Gibson Dunn"), for their Complaint against Defendants Neil Shekhter ("Shekhter"), Margot Shekhter, NMS Properties, Inc. ("NMS Properties"), and NMS Capital Partners I, LLC ("NMS Capital" or "Operating Member") (collectively, "Defendants" or "NMS") hereby allege:

## NATURE OF THE ACTION

1.    Since at least 2013 and continuing to the present, defendant Neil Shekhter and his co-defendants and co-conspirators have conspired to injure Plaintiffs through a fraudulent and extortionate scheme designed to pressure AEW into selling its interest in the Joint Venture formed between AEW and NMS Capital to Shekhter/NMS (the "Joint Venture"), against AEW's wishes and at a price many millions of dollars below what it was worth.  The outrageous and illegal conduct of Shekhter and his co-defendants and co-conspirators includes forging documents and passing them off to banks, courts and third parties, and subjecting Plaintiffs to a multi-year campaign of harassment that has not ended to this day, even after the Los Angeles Superior Court in the *Lincoln Studios* case expressly held that Defendants had engaged in forgery, perjury and the massive destruction of evidence in violation of multiple court orders (the "Lincoln Studios Litigation").

2.    Neil Shekhter is the CEO of NMS Properties; he is, along with his wife, Margot Shekhter, a Trustee of The NMS Family Living Trust dated September 3, 1991 (2000 Restatement) (the "Trust"); and he is the manager of NMS Capital Partners, LLC, the sole member and manager of NMS Capital Partners I, LLC (collectively, "NMS").  NMS owns, manages and develops residential properties throughout Los

Angeles.  Currently, NMS claims to own or manage over 75 properties in Los Angeles County, which house over 2,000 apartments and over 4,000 tenants.

3.      The global financial crisis hit many real estate developers hard and Neil Shekhter was no exception.  In 2010, with multiple properties having deteriorated in value and facing loan maturities, Shekhter sought to enter into a joint venture that would not only save properties held for development owned by companies he controlled from imminent foreclosure, but would pay for the development of those properties into apartment projects.  Shekhter negotiated a joint venture agreement on behalf of NMS Capital to form a joint venture (the "Joint Venture") between NMS Capital and AEW, an affiliate of AEW Partners VI, L.P. ("AEW P6"), a real estate private equity fund advised by AEW Capital Management, L.P. ("AEW CM").[1]

4.      The purpose of the Joint Venture was to acquire, develop and operate residential properties in Los Angeles.  The Joint Venture—of which AEW and NMS Capital were the only members—ultimately acquired nine multi-unit residential apartment buildings in Los Angeles (the "Joint Venture Properties" or "Properties," each a "Property").  As the Joint Venture developed the Properties for residential use, their value rapidly increased.

5.      The Joint Venture Agreement ("JVA"), signed by the parties in September 2010, contained a waterfall provision that set forth, absent a default by NMS as defined by the JVA, the order in which distributions of Joint Venture income could be distributed by the Joint Venture at the direction of AEW, the Investor Member, although the Investor Member maintained the sole discretion to determine whether any distributions would be made and if so in what amount.  The Investor Member was entitled to receive all of its capital contributions and an agreed upon rate of return on

---

[1] AEW CM is a real estate investment advisor.  It provides investment management and related services to institutional investors who seek to benefit from real estate as an investment asset.  Its clients consist primarily of retirement funds, including retirement funds for health care workers, teachers, police officers, and firefighters.

its investment before NMS would receive any distributions.  The waterfall provision also included a "cap" on the Investor Member's total return on its investment in the Joint Venture if the Investor Member received through Joint Venture distributions all of its capital back plus a 24% return on its investment in less than five years from the execution of the JVA in September 2010—something that was totally within the Investor Member's control as it had the sole discretion to determine whether to sell all or any portion of the Joint Venture's portfolio and whether to cause the Joint Venture to make any distributions.

6.     The JVA did not contain a mechanism for either party to unilaterally "buy out" the other's interest in the Joint Venture.  It did contain, however, a "Buy/Sell" mechanism (defined in the JVA as "the Buy Out Rights") that would allow either party, after five years from the execution of the JVA, to trigger the Buy/Sell provisions by issuing a Buy/Sell Offer Notice identifying a price at which it would agree to be a buyer of the other member's interest in the Joint Venture or the seller of its own interest in the Joint Venture to the other member.  Once triggered, the other member would be able to decide whether to act as the buyer or the seller at that price.  Because the Buy/Sell provisions could not be triggered until at least five years after execution of the JVA, NMS had no right to trigger an "exit" event before the five-year mark. The Investor Member, however, could trigger the sale of the portfolio at any time in its sole discretion.  These were the terms that AEW required when negotiating the JVA and these were the terms that the parties agreed to and which were set forth in the executed JVA.

7.     In 2013, however, with real estate values rebounding and the real estate market stabilizing, Shekhter began to regret the deal he made on behalf of NMS in 2010.  He wanted to be able to force AEW to sell its interest in the Joint Venture to him prior to the five-year mark in order to "cap" AEW's return on its investment and steal any gains above that amount for himself and his co-conspirators.  Shekhter asked AEW to voluntarily sell him its interest in June 2013, less than three years into the

1    Joint Venture, and when he realized that AEW would not voluntarily sell its interest

2    and give up potentially tens of millions of dollars to which it was entitled, Shekhter

3    and his co-conspirators set about to defraud and/or extort AEW into selling its interest

4    to Shekhter before the five-year date could be reached.

5         8.    Shekhter forged a version of the JVA (which he would later call "Version

6    2" of the JVA) that altered the Buy/Sell provision so that it would look like it could be

7    triggered in three years rather than the five years that the parties had agreed to.

8    Specifically, Shekhter and his co-conspirators used PDF overwriting software to alter

9    the number "5" and the word "five" that existed in Section 11.1(a)(i) of the executed

10   JVA into the number "3" and the word "three."  Shekhter first emailed the forged

11   "Version 2" to KeyBank, a federally insured bank that acted as one of the Joint

12   Venture's lenders, telling the bank that it was the only JVA he had ever "executed,"

13   and then he had NMS' in-house counsel email a copy of the forgery to AEW's counsel

14   on July 19, 2013, claiming for the first time that "Version 2" was the document that

15   Shekhter had allegedly signed in September 2010.  The aim of Shekhter and his co-

16   conspirators was to paralyze AEW and, ultimately, paralyze the Joint Venture's banks,

17   sowing confusion among the banks as to whether there ever was a valid JVA between

18   NMS and AEW and if so whether it was "Version 2" or the copies that had been

19   signed and circulated to the banks over the prior three years.  Shekhter and his co-

20   conspirators believed that in order to avoid defaulting on Joint Venture loans, which

21   would start to come due not long after the forgery was created, and to avoid harming

22   its reputation in the marketplace, AEW would be forced to sell Shekhter its interest in

23   the Joint Venture long before the five-year mark and at a substantially reduced price.

24        9.    When AEW did not immediately cave to Shekhter's scheme, however,

25   Shekhter and his co-conspirators began a multi-faceted and multi-year campaign of

26   harassment of AEW, its employees and affiliates, its counsel, its investors, its auditors,

27   and anyone else that dared to do business with AEW in connection with the Joint

28   Venture.  Defendants initially sued AEW's former deal counsel, DLA Piper and

Seyfarth Shaw, in Los Angeles Superior Court in what became known as the Lincoln Studios Litigation.  Defendants alleged that AEW's counsel were actually NMS' counsel and negligently drafted the JVA in a manner that obscured NMS' purported (but actually non-existent) right to force AEW to sell its interest to NMS in three years. Interestingly, however, Defendants did not make any mention of the "Version 2" forgery of the JVA in their initial complaints against either AEW's former deal counsel or NMS' own former deal counsel, whom they also sued.  But in April 2015, Defendants amended their complaint in the Lincoln Studios Litigation to expressly reference and rely upon the "Version 2" forgery and name as defendants both AEW and most of the Plaintiffs in the instant action.

10.    The Lincoln Studios Litigation was a sham lawsuit directed and funded by Shekhter for the purpose of furthering the fraudulent, extortionate and criminal scheme carried out by Shekhter and his co-conspirators.  Not only were Defendants attempting to defraud the court and extort AEW by relying on a known forgery but they sought to intimidate Plaintiffs by seeking almost $12 billion in alleged damages.

11.    Defendants also forged and fabricated a Property Management Agreement ("PMA") for one of the Properties by fraudulently changing a key term in the PMA from "30 days" to "60 days" in an attempt to prevent NMS Properties' removal as the property manager of the Properties.  Defendants knowingly submitted the forged and fabricated PMA to the court and made false statements to the court about its origins.

12.    In addition to the sham Lincoln Studios Litigation, Defendants have also filed seven other lawsuits against various Plaintiffs arising out of the Joint Venture and, in each, continue to make false and misleading representations based on the forged documents and continue to dispute Plaintiffs' rights under the JVA based on false allegations.  This never-ending series of lawsuits were filed against Plaintiffs to further Defendants' fraudulent and extortionate scheme by attempting to prevent Plaintiffs from asserting clear title to the Properties, re-financing loans that went into

default and from selling the Properties to anyone other than Defendants—even after Plaintiffs prevailed in the Lincoln Studios Litigation.

13.    In furtherance of and as yet another element to the extortionate scheme, Defendants have engaged in a long-running campaign of harassment and intimidation. For years, Shekhter, with Defendants' knowledge and approval, has continuously unleashed hundreds if not thousands of false and misleading emails to representatives of Plaintiffs, third-party lenders, auditors, property managers, title insurance companies, potential buyers, former employees, counsel, and countless others.  These emails contained ominous and threatening messages, often flooding recipients' inboxes in the middle of the night.  In some instances, Shekhter forwarded the same threatening emails 10 times or more to the same recipients, many of whom are high- level executives at AEW CM who had no involvement in the transaction, including even AEW CM's CEO.  For instance, on February 19, 2016, Shekhter emailed Samek, copying an AEW executive in Massachusetts as well as two representatives of a third party lender (including one in New York), warning:  "***Remember what goes around comes around***.  Goodnight." (Emphasis added.)  These emails—like the forgeries, the perjury, and the sham lawsuits—were intended to (and did) instill fear in Plaintiffs.

14.    Through their criminal and tortious conduct, Defendants have violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 28 U.S.C. § 1961 *et seq.*, slandered Plaintiffs' title to the Properties, converted Plaintiffs' funds, and have tortiously interfered with Plaintiffs' contracts and prospective economic advantage.  In addition, Defendants Neil and Margot Shekhter have materially breached their obligations under the Undertaking of Principals to indemnify AEW for Defendants' fraud, misrepresentations, willful misconduct, bad faith acts, and misappropriation of funds and property.

15.    As the direct, proximate, and foreseeable result of Defendants' tortious and criminal misconduct, Plaintiffs have suffered substantial injuries, including, but not limited to:  millions of dollars in legal fees incurred in defending against

Defendants' extortionate threats, fraudulent misrepresentations and omissions, and sham lawsuits; millions of dollars in costs incurred in mitigating the impact of Defendants' pervasive misconduct, such as the default interest and fees that Plaintiffs incurred as a result of Defendants' fraudulent misrepresentations to the Joint Venture's lender; and tens of millions of dollars in lost sale proceeds. Plaintiffs are entitled to treble damages and attorneys' fees under the federal RICO laws, and compensatory and punitive damages under California law.

## THE PARTIES

### A.    Plaintiffs

16.    Plaintiff P6 LA MF Holdings I LLC ("Joint Venture") is a Delaware limited liability company. The Joint Venture was created by the Limited Liability Company Agreement for P6 LA MF Holdings I LLC (the "JVA"), dated as of September 8, 2010, which was entered into by AEW and NMS Capital. Prior to November 2016, the Joint Venture owned and controlled nine Properties through eight subsidiary companies ("Subsidiary Companies") as follows:

| Subsidiary Company | Property Address(es) | Property Name |
|---|---|---|
| 1410 5th Street, LLC | 1410 5th Street, Santa Monica, CA 90401 | Lido |
| NMS Broadway, L.P. | 829 Broadway, Santa Monica, CA 90401 | Quonset |
| Lincoln Walk Studios, LP | 1441 Lincoln Blvd., Santa Monica, CA 90401 | Lincoln Walk |
| Luxe 1420 5, LLC | 1420 5th Street, Santa Monica, CA 90401 | San Marco |
| Luxe 1440 5, LLC | 1430 5th Street, Santa Monica, CA 90401 | Rapallo |
| Luxe Washington, LLC | 9901 Washington Blvd., Los Angeles, CA 90232 | Luxe Washington |
| Luxe Broadway, LLC | 1502 Broadway, Santa Monica, CA 90401<br><br>1511 15th Street, Santa Monica, CA 90404 | Luxe Broadway |
| Luxe La Cienega, LLC | 375 N. La Cienega Blvd., West Hollywood, CA 90048 | Luxe La Cienega |

Gibson, Dunn & Crutcher LLP

17.     Plaintiff P6 LA MF Holdings SPE, LLC ("AEW" or "Investor Member") is a Delaware limited liability company.  Pursuant to Article 8.1 of the JVA, the Investor Member has the power and authority, exercisable at its sole discretion, to act for the Joint Venture, including the right to commence suit on behalf of and to represent the Joint Venture and the Subsidiary Companies in legal proceedings.

18.     Plaintiff Luxe Broadway, LLC is a California limited liability company. It is a Subsidiary Company of and wholly owned by the Joint Venture.  Luxe Broadway, LLC is the former owner of two properties located at 1502 Broadway, Santa Monica, CA 90404 and 1511 15th Street, Santa Monica, CA 90404.

19.     Plaintiff Luxe La Cienega, LLC is a California limited liability company. It is a Subsidiary Company of and wholly owned by the Joint Venture.  Luxe La Cienega, LLC is the former owner of 375 N. La Cienega Blvd., West Hollywood, CA 90048.

20.     Plaintiff Luxe Washington, LLC is a California limited liability company. It is a Subsidiary Company of and wholly owned by the Joint Venture.  Luxe Washington, LLC is the former owner of 9901 Washington Blvd., Los Angeles, CA 90232.

21.     Plaintiff 1410 5th Street, LLC is a California limited liability company.  It is a Subsidiary Company of and wholly owned by the Joint Venture.  1410 5th Street, LLC is the former owner of 1410 5th St., Santa Monica, CA 90401.

22.     Plaintiff 1420 5, LLC is a California limited liability company.  It is a Subsidiary Company of and wholly owned by the Joint Venture.  1420 5, LLC is the former owner of 1420 5th St., Santa Monica, CA 90401.

23.     Plaintiff 1440 5, LLC is a California limited liability company.  It is a Subsidiary Company of and wholly owned by the Joint Venture.  1440 5, LLC is the former owner of 1430 5th Street, Santa Monica, CA 90401.

24.     Plaintiff NMS Broadway, L.P. is a California limited partnership.  It is a Subsidiary Company of and wholly owned by the Joint Venture.  NMS Broadway, L.P. is the former owner of 829 Broadway, Santa Monica, CA 90401.

25.     Plaintiff Lincoln Walk Studios, LP is a California limited partnership.  It is a Subsidiary Company of and wholly owned by the Joint Venture.  Lincoln Walk Studios, LP is the former owner of 1447 Lincoln Blvd., Santa Monica, CA 90401.

26.     All of the Subsidiary Companies are controlled by the Joint Venture and by the Investor Member.

**B.     Defendants**

27.     Defendant Neil Shekhter is, upon information and belief, an individual residing in Los Angeles County, California, with an intention to reside there indefinitely, and is therefore a citizen of the State of California.  Exercise of jurisdiction over him is reasonable and proper in this District for the reasons set forth in paragraph 41, *infra*.  Shekhter is, and at all relevant times has been, the Chief Executive Officer of NMS Properties, Inc. ("NMS Properties") and the manager of NMS Capital and NMS Capital Partners, LLC, the sole member of NMS Capital. Shekhter and his wife, Margot Shekhter, are the Trustees of The NMS Family Living Trust dated September 3, 1991 (2000 Restatement).

28.     Defendant Margot Shekhter is, upon information and belief, an individual residing in Los Angeles County, California, with an intention to reside there indefinitely, and is therefore a citizen of the State of California.  Exercise of jurisdiction over her is reasonable and proper in this District for the reasons set forth in paragraph 41, *infra*.  Margot Shekhter is, and at all relevant times has been, either the Chief Financial Officer or President of NMS Properties, and has managed the business.

29.     Defendant NMS Properties, Inc. is, upon information and belief, a California corporation, and is therefore a citizen of the State of California.  Exercise of jurisdiction over it is reasonable and proper in this District for the reasons set forth in paragraph 41, *infra*.

30.     Defendant NMS Capital Partners I, LLC ("NMS Capital" or the former "Operating Member") is, upon information and belief, a limited liability company organized under the laws of California, and is therefore a citizen of the State of California.  Exercise of jurisdiction over it is reasonable and proper in this District for the reasons set forth in paragraph 41, *infra*.

31.     The true names and capacities, whether corporate, associate, individual, or otherwise of Defendants DOES 1 through 10, inclusive, are unknown to Plaintiffs, which therefore sues said Defendants by such fictitious names.  Plaintiffs are informed and believe and thereupon allege that each Defendant designated herein as Doe is responsible in some manner for the events and happenings referred to herein and proximately caused damages to Plaintiffs as alleged herein, either by such Doe Defendant's own conduct or through the conduct of his, her or its agents, servants, employees, representatives, associates, partners, joint venturers, co-conspirators, or alter egos.  Plaintiffs will amend this Complaint to allege their true names and capacities when the same have been ascertained.

**C.     Non-Party Co-Conspirators**

32.     Certain other non-party individuals and entities played roles, direct or indirect, in Defendants' fraudulent and extortionate scheme (collectively, the "Non-Party Co-Conspirators").  Foremost among these individuals and entities are the following:

33.     Adam Shekhter is, upon information and belief, a resident of the State of California.

34.     Alan Shekhter is, upon information and belief, a resident of the State of California.

35.     Enrique Sanchez is, upon information and belief, a resident of the State of California.

36.     Brian Bowis is, upon information and belief, a resident of the State of California.

37.     Eddie Valentin is, upon information and belief, a resident of the State of California.

38.     Louis R. (Skip) Miller ("Miller") is, upon information and belief, a resident of the State of California, a member of the Bar of the State of California, and a partner in Miller Barondess LLP.  Upon information and belief, Miller entered into the conspiracy in or around January 2015.

39.     Steven Zelig ("Zelig") is, upon information and belief, a resident of the State of California, a member of the Bar of the State of California, and a shareholder in Brentwood Legal Services, LLP.  Upon information and belief, Zelig entered into the conspiracy in or around July 2013.

## SUBJECT MATTER JURISDICTION AND VENUE

40.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).  Plaintiffs' first claim for relief arises under 18 U.S.C. § 1961 *et seq.*, as hereinafter more fully appears.  Moreover, Plaintiffs' state law claims arise out of the same case or controversy as its federal law claims, as all claims in this action arise out of a common nucleus of operative facts.  Thus, this Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

41.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965(a) because, on information and belief, all Defendants reside and transact their affairs in this District and because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## PERSONAL JURISDICTION

42.     Exercise of jurisdiction over Defendant Neil Shekhter is reasonable and proper in this District because Shekhter is a citizen of the State of California and because he conducts extensive business activities within the state.  Shekhter is the CEO of NMS Properties and the manager of NMS Capital, both of which are located in and do business in the State of California.  Through his activities in California, Shekhter

has served as the ringleader in the enterprise to harm Plaintiffs, working closely with the other Defendants and non-party Co-Conspirators. For Plaintiffs' claims pursuant to 18 U.S.C. § 1962 and California state law, exercise of jurisdiction over Shekhter is proper pursuant to 18 U.S.C. § 1965(a) and California Code of Civil Procedure § 410.10.

43.    Exercise of jurisdiction over Defendant Margot Shekhter is reasonable and proper in this District because Margot Shekhter is a citizen of the State of California and because she is the President and former CFO of NMS Properties, which is located in and does business in the State of California. Through her activities in California, Margot Shekhter has authorized the filing and prosecution of the sham Lincoln Studios Litigation and purported to verify the authenticity of the forged "Version 2" in the sham Lincoln Studios Litigation. For Plaintiffs' claims pursuant to 18 U.S.C. § 1962 and California state law, exercise of jurisdiction over Margot Shekhter is proper pursuant to 18 U.S.C. § 1965(a) and California Code of Civil Procedure § 410.10.

44.    Exercise of jurisdiction over Defendant NMS Properties is reasonable and proper in this District because it is based in the State of California, is incorporated in the State of California, and does business the State of California. Through its activities in California, NMS Properties has served as a manager in the enterprise to harm Plaintiffs, working closely with the other Defendants and non-party Co-Conspirators. For Plaintiffs' claims pursuant to 18 U.S.C. § 1962 and California state law, exercise of jurisdiction over NMS Properties is proper pursuant to 18 U.S.C. § 1965(a) and California Code of Civil Procedure § 410.10.

45.    Exercise of jurisdiction over Defendant NMS Capital is reasonable and proper in this District because it is based in the State of California, is organized under the laws of the State of California, and does business in the State of California. Through its activities in California, NMS Capital has served as a manager in the enterprise to harm Plaintiffs, working closely with the other Defendants and Non-Party

Co-Conspirators.  For Plaintiffs' claims for violations of 18 U.S.C. § 1962 and California state law, exercise of jurisdiction over NMS Capital is proper pursuant to 18 U.S.C. § 1965(a) and California Code of Civil Procedure § 410.10.

## FACTUAL BASIS FOR CLAIMS

### A.    The Parties Discuss Entering into a Potential Joint Venture

46.    In early 2010, during the depths of the real estate crash, Neil Shekhter of NMS Capital and NMS Properties and Eric Samek of AEW began discussing a potential real estate joint venture to acquire and develop properties in an otherwise depressed Los Angeles real estate market lacking in available capital.  Among other things, the parties discussed an arrangement whereby an affiliate of AEW would provide capital for and exercise control over the joint venture while NMS (run and operated by Neil Shekhter) would manage the prospective joint venture properties day-to-day subject to the joint venture agreement and an agreed upon form property management agreement.  At the time, both parties were represented by skilled and able counsel—DLA Piper, LLC ("DLA") for AEW and Sheldon Chernove ("Chernove") and Schultz & Wright, LLP ("S&W") for NMS Properties—and all aspects of the joint venture agreement were heavily negotiated in arm's-length discussions.

47.    On or about May 26, 2010, after some negotiations, AEW P6 and NMS Properties entered into a non-binding Term Sheet outlining the general terms and conditions upon which a joint venture would be formed and invest in the acquisition and development of multi-family properties in Los Angeles, California.

48.    The non-binding Term Sheet included a potential "Buy/Sell" provision, by which either member of the proposed joint venture could "trigger a Buy/Sell for individual properties at the later of (i) three years from the acquisition of the property for which the Buy/Sell is being triggered or (ii) the stabilization of the property for which the Buy/Sell is being triggered."  The Term Sheet, as drafted, reflected the parties' then-existing understanding regarding the general parameters of a future

1    agreement, but expressly stated that it was not legally binding, a point that Neil

2    Shekhter reiterated when he returned his executed copy to AEW.

3    **B.    The Parties Negotiate and Draft the JVA**

4        49.    On or about July 7, 2010, DLA circulated the first draft of the joint

5    venture agreement to the parties and their counsel (the "July 7 Draft").  The July 7

6    Draft included a Buy/Sell provision in Article 11 (the "Buy/Sell Provision" or the

7    "Buy/Sell"), which provided, in relevant part, that "[a]t any time after the later to occur

8    of (i) twelve (12) months after the expiration of the Investment Period, and (ii) the last

9    Property purchased by the Company or any Subsidiary Company [of the Joint Venture]

10   prior to the end of the Investment Period has achieved a stabilized occupancy of 95%,

11   either the Operating Member or the Investor Member may give a Buy/Sell Offer

12   Notice."  Twelve months after the Investment Period was equal to three years based on

13   the two-year Investment Period that was contemplated in the July 7 Draft, and

14   "stabilization" was defined as 95% occupancy at the last Property acquired by the Joint

15   Venture.  This was the formula being discussed to determine when the Buy/Sell rights

16   could be triggered; under the formula then contemplated, the only way the Buy/Sell

17   could be triggered in three years was if the last acquired Property was already 95%

18   occupied before the three-year anniversary after the execution of the joint venture

19   agreement.  To put this into perspective, the last acquired Joint Venture Property still

20   had not reached 95% occupancy five years after the JVA was executed.  The Buy/Sell

21   Provision was defined in the draft JVA, and ultimately in the executed JVA, as "the

22   Buy Out Rights."

23       50.    The Buy/Sell Provision that the parties ultimately agreed to did not

24   include the formula contained in the July 7 Draft and non-binding Term Sheet.

25   Instead, as set forth below, the parties agreed that the Buy/Sell could not be triggered

26   before the five-year anniversary after the execution of the JVA.  However, while the

27   timing of the Buy/Sell rights changed, the general parameters for the Buy/Sell Offer

28   Notice remained largely the same throughout the negotiations: once a Buy/Sell Offer

Notice could be issued, either party could issue the Notice but neither could guarantee it would turn out to be the buyer or the seller. All it could do was trigger the process and name the price at which it would be willing to be a buyer or seller and the other party could determine whether to buy or sell. This Buy/Sell Offer Notice right was the only right ever negotiated or agreed to by which NMS could trigger an exit by one party or the other from the Joint Venture. The Investor Member, AEW, on the other hand, retained the exclusive right to sell the Joint Venture's Properties, in its sole discretion, in every draft of the JVA and in the executed JVA.

51. On or about July 28, 2010, Chernove, on behalf of NMS Properties, provided extensive comments and edits to the July 7 Draft of the JVA. In his comments to Article 11, Chernove stated that the Buy/Sell Provision should not be activated at any time *before five years*, writing:

**[THIS ENTIRE SECTION NEEDS FURTHER DISCUSSION BUT IT SHOULD NOT BE TRIGGERED BEFORE THE EXPIRATION OF THE 5 YEAR PERIOD WHEN THE TARGET DISTRIBUTION IS TO BE ACHIEVED].**

52. This was consistent with Chernove's comments to Article 6, which related to the timing of distributions. Chernove stated that the final level of the distribution waterfall should be "EFFECTIVE ONLY IF THE 24% IRR and 1.75 x EQUITY IS NOT ACHIEVED WITHIN 60 MONTHS." Chernove's marked-up copy of the July 7 Draft was sent by Jim Andersen, then Chief Operating Officer of NMS, to Neil Shekhter, as well as to AEW's Eric Samek, in an email dated July 28, 2010. Chernove later testified under oath that he wrote the comments—requesting that the earliest time for either party to issue a Buy/Sell Offer Notice be changed from the formula to five years—and that there were no typos contained in his comments.

53. Around the same time, consistent with Chernove's written comments, Jim Andersen (who participated extensively in the negotiations) called AEW's Jonathan Watson (who also participated in the negotiations) to ask that the Buy/Sell Provision being negotiated be changed to a minimum of five years because NMS was concerned

Gibson, Dunn & Crutcher LLP

that it would not be able to compete with AEW in any Buy/Sell if it were triggered before the fifth year.

54.    In response to the written and oral requests, AEW agreed to change the Buy/Sell Provision so that it would not be available until five years after execution. On or about August 11, 2010, DLA circulated the next draft of the joint venture agreement (the "August 11 Draft").  The August 11 Draft inserted (in redline) the five-year Buy/Sell Provision NMS Properties requested:  "At any time after *five (5) years from the date hereof*, either the Operating Member or the Investor Member may give a Buy/Sell Offer Notice."



This language remained intact through every subsequent draft of the JVA, and survives to this day in the operative JVA.  Indeed, the lead attorney and paralegal working on the transaction at DLA, and who later moved to the law firm of Seyfarth Shaw, both

testified under oath that this change was made in response to NMS' requests, as described above. A contemporaneous internal memorandum at AEW also confirmed this change and that it was made at the request of NMS.

**August 30, 2010 AEW Memorandum**



55.     Following the August 11 Draft, the parties circulated four more drafts of the JVA. All four drafts provided for a 5-year Buy/Sell.

**C.    The Parties Execute the JVA**

56.     On or about September 8, 2010, the Investor Member and the Operating Member executed the JVA. The JVA contained, in Article 11, the 5-year Buy/Sell Provision described above.

**D.    Neil and Margot Shekhter Execute the Undertaking of Principals**

57.     On or about September 8, 2010, concurrent with the execution of the JVA, Neil and Margot Shekhter executed the Undertaking of Principals (as amended, the "Undertaking"). Neil Shekhter executed the Undertaking in his individual capacity and in his capacity as Trustee of the Trust. Margot Shekhter executed the Undertaking in her capacity as Trustee of the Trust. A true and correct copy of the Undertaking as amended is attached as **Exhibit 1** to this Complaint.

58.     As set forth in the Undertaking, Neil Shekhter and the Trust (collectively, the "Principals") executed and delivered the Undertaking to induce the Investor Member to enter into the JVA and to make substantial capital contributions to the Joint Venture. Indeed, Article 8.21 of the JVA expressly references the Undertaking, underscoring its materiality to the transaction.

59.    Paragraph 1 ("Indemnity for Bad Acts") of the Undertaking sets forth the indemnification obligations of the Principals.  Specifically, Paragraph 1 provides:

> The Principal and the Trust (collectively, the "Principals") agree to indemnify, defend and hold the Company and Investor Member harmless from and against any liability, loss, cost (including reasonable attorney's fees) or damages arising from:
>
> (a) any fraud, willful misconduct, gross negligence or any intentional misrepresentation of any material fact (including, but not limited to, the representations and warranties set forth on Schedule 2.3(a) to the LLC Agreement) by Operating Member or any Person controlling, controlled by or under common control with Operating Member (any such Person, a "Controlled Affiliate") in connection with the LLC Agreement, the Company, a Subsidiary Company or with respect to any Property;
> (b) any misappropriation or embezzlement of funds of the Company or any Property by Operating Member or any of its Controlled Affiliates;
> (c) any act of intentional damage, arson or intentional physical waste of or to the Property by Operating Member or any of its Controlled Affiliates;
> (d) actions taken, or omitted to be taken, with respect to the Company or the Property in bad faith on the part of Operating Member or any of its Controlled Affiliates;
> (e) Operating Member, the Property Manager or the Developer Manager (as long as they are an Affiliate of Operating Member), a Principals, the Approved Substitute Principal or any of their respective Affiliates or Related Parties: (1) bringing or participating in, or acting in concert with others to bring, any voluntary or involuntary bankruptcy, liquidation, receivership or similar proceeding against the Subsidiary Company or the Company or any Member; (2) being listed as a petitioning creditor in any such proceeding; or (3) soliciting or causing to be solicited petitioning creditors for any such proceeding; and/or
> (f) any Transfer of Operating Member's interest in the Company or of the Principals' indirect interest in the Company, in either case, in violation of the LLC Agreement.

60.    In turn, Paragraph 7 ("Expenses and Damages") of the Undertaking provides that the Principals "shall pay to Investor Member within ten (10) days after demand any and all actual and reasonable expenses, losses, costs or damages paid or incurred by Investor Member, including reasonable attorneys' fees and disbursements, as a result of a breach by the Principals of an obligation under this letter, together with interest at 12% per annum, but in no event at a rate which exceeds the highest rate permitted by applicable law, on any amounts owing under this letter from the date paid or incurred by Investor Member until paid by the Principals."

61.    Since its execution, the Undertaking has been amended from time to time by mutual agreement of the Investor Member and the Principals.  None of the amendments has modified or altered the Principals' indemnification obligations under Paragraphs 1 and 7.

**E.    The Parties Amend the JVA**

62.    The JVA was amended several times:  three times by substitution pages and ten times by standalone Amendments.  The first amendment by substitution pages took place only days after the execution of the JVA when Michelle McClure of DLA noticed a typo in the definition of "Capital Contribution Percentage."  On or about September 10, 2010, McClure proposed changing the page to address the typo, and Chernove gave McClure permission to "make the changes you suggest and to substitute the pages."  Afterward, McClure circulated the amended JVA back to Chernove, Andersen, and others, copying Neil Shekhter and explaining:  "I noticed a typo in one of the definitions and Sheldon [Chernove] has authorized me to change out the page.  He asked that I circulate a final, executed LLC agreement of P6 LA MF Holdings I LLC for your files."  Neil Shekhter did not object to the copy of the JVA that McClure circulated, even though it included the five-year Buy/Sell Provision.

63.    The next amendment by substitution took place on or about September 30, 2010.  That day, McClure sent Chernove an email with the subject line:  "Broadway Closing – one more change to P6 LA MF Holdings I LLC agreement."  In her email, McClure asked Chernove to "[p]lease authorize the substitution in the below definition of Subsidiary company in the PF LA MF Holdings I LLC agreement.  It just came to our attention that NMBroadway Studios, LLC was the prior owner of the Broadway Property and, as a result, we just wanted it to be clear that the Subsidiary Company included it in the definition."  Chernove replied, "[t]his is fine."

64.    On or about November 9, 2010, in conjunction with the closing of the Property at 1447 Lincoln Boulevard in Santa Monica, California, Neil Shekhter executed the "First Amendment" to the JVA.  That amendment provides that "[e]xcept

as provided in this Amendment, the Original LLC Agreement shall remain in full force and effect and unmodified" (the "no modification clause").  Because the amendment did not address the Buy/Sell Provision, the five-year term remained unchanged.  On or about December 14, 2010, Neil Shekhter executed the "Second Amendment" to the JVA, which contained the same no modification clause and also did not change the Buy/Sell Provision.

65.     As executed, the JVA required the Operating Member to fund 30% of capital contributions and the Investor Member to fund the remaining 70%.  Shortly after the JVA was executed, it became clear that the Operating Member was either unable or unwilling to meet its contractual obligation to fund 30% of the capital contributions.  As a result, AEW agreed to amend the JVA so that the parties would have the flexibility to fund future contributions for individual Properties at amounts other than the 70/30 split originally required.

66.     On or about January 6, 2011, McClure emailed all parties and their counsel, stating:  "Since capital for some of the properties is not being contributed on a 70/30 basis, we concluded that certain changes to the Master JV LLC agreement were appropriate.  Rather than putting these changes in a separate agreement, we thought it made more sense to revise the Master and substitute pages."  She then asked the parties and their counsel to review and approve the changes, which included the insertion of the term "Specified Property"—defined as any property in which the capital contribution percentages, and thus the ownership interests of the Members, differs from the general percentage interests (e.g., 90/10 as opposed to 70/30).  The parties and their counsel approved the changes.  This was the third amendment to the JVA made by substitution pages.  Importantly, the JVA, as amended by the January 6, 2011 request, is the contract on which the parties have based their conduct since then, including in capital calls requested by NMS.

67.     On or about January 31, 2011, while working on the closing binders for the transaction, McClure noticed that "there were a few slight errors and some clean up

changes needed in the Amendment to the Undertaking of Principals." As a result, she emailed Tom Johnston of S&W, then counsel for NMS, attaching a "clean and redline version of the Second Amendment to the LLC Agreement (which adds in that 'Specified Property' concept from the revised LLC agreement)." She then asked, "[i]f the changes meet with your approval, please email me back that you agree that I can change the pages in our executed copies for inclusion in the closing binders." On or about February 3, 2011, Johnston responded: "These changes are approved; you are authorized to substitute pages in the originals as necessary." The closing binders created for the Joint Venture contained all three amendments by substitution.

68.    After the January 6, 2011 amendments (the "Specified Properties Amendments"), NMS approved and executed eight additional freestanding amendments, several of which designated various Properties as Specified Properties, a term which would not exist but for the January 6, 2011 amendments. All eight of the post-January 6, 2011 amendments—dated January 21, 2011, April 13, 2011, July 27, 2011, September 27, 2011, January 9, 2012, March 14, 2012, and June 1, 2012—contained the no modification clause, and none sought to change the 5-year Buy/Sell Provision.

69.    While the JVA has been amended on a number of occasions, as set forth above, none of these amendments modified the 5-year Buy/Sell Provision in Article 11. A true and correct copy of the JVA, as amended by slipsheet pages, is attached as **Exhibit 2** to this Complaint. True and correct copies of the ten executed standalone amendments are attached as **Exhibit 3** to this Complaint.

70.    On or about July 28, 2011, Shekhter certified to a Joint Venture lender, on behalf of NMS, that the true, correct, and operative agreement was the JVA containing the January 2011 amendments, i.e., Exhibit 2. As certified, the JVA reflected the same 5-year Buy/Sell Provision that existed in every copy and version of the JVA following Chernove's July 28, 2010 comments.

71.     At many other times between September 8, 2010 and the present, NMS circulated and otherwise relied upon the amended JVA with the 5-year Buy/Sell Provision.  Indeed, all copies of the JVA circulated before July 2013 reflect the 5-year Buy/Sell Provision.

**F.     Shekhter Forges a Version of the JVA with a 3-Year Buy/Sell Provision to Extort AEW into Selling Its Membership Interest Before the Five-Year Anniversary and at a Substantial Discount**

72.     By 2013, the value of the Joint Venture's Properties had rebounded in value.  Unhappy with the deal he had struck, Shekhter began exploring ways to squeeze out the Investor Member and keep most of the Joint Venture's profits for himself and NMS.

73.     Recognizing he could not trigger the Buy/Sell because five years had not elapsed, Shekhter instead proposed a transaction by which the Investor Member would voluntarily transfer its membership interest to the Operating Member in less than three years—and at a substantial discount.  Specifically, on or about June 26, 2013, Shekhter sent a letter to Samek suggesting the "structuring of a single transaction where the Investor Member would receive, concurrently with the closing of such transaction, (i) an IRR of 24% and (ii) aggregate distributions equal to the product of 1.75 multiplied by the Investor Member's aggregate Capital Contributions," and "[u]pon such payment, the Investor Member would withdraw as a Member of the Company [i.e., the Joint Venture] and have no further rights or obligations under the LLC Agreement."  As part of Shekhter's June 26 proposal, he suggested "cleaning up the LLC Agreement" and amending it "to provide for the withdrawal of the Investor Member."  In other words, Shekhter acknowledged and recognized that NMS had no unilateral right to require AEW to sell its interests.  AEW was not interested in Shekhter's proposal.

74.     Not to be deterred, however, Shekhter and his co-conspirators began their campaign of forgery and intimidation to force AEW to sell its interest against its will.

On or about July 12, 2013, Steve Williford, NMS Properties' General Counsel, emailed Drew Flowers, a partner with Gibson Dunn, which was then representing the Investor Member.  Williford asked Flowers for help in determining which of the two versions of the JVA attached to his email was the operative "version:"  (1) the copy attached to McClure's September 10, 2010 email (i.e., the original, executed JVA with the first two sets of slipsheet pages substituted in, but not the slipsheet pages agreed to in January 2011 containing the Specified Properties language); or (2) the copy attached to McClure's January 20, 2011 email (i.e., Exhibit 2, which contains the additional slipsheet pages referencing Specified Properties).  Notably, both copies contained the agreed upon 5-year Buy/Sell Provision.

75.    Shekhter then created the forged "Version 2" of the JVA through a complex, multi-step process—one that AEW's experts in the Lincoln Studios Litigation were able to reconstruct through a forensic examination of the hard-copy forgeries and NMS' devices and electronic data, to the extent that their devices and data were produced pursuant to court order or were otherwise recoverable. Specifically, on July 12, 2013, not long after Williford sent his July 12, 2013 email, Shekhter forwarded Williford's email, including the PDF attachments, to his son Adam Shekhter; this included a PDF version of the original executed JVA with the 5-year Buy/Sell Provision in an electronic file named "P6 LA MF Holdings I LLC.pdf." On information and belief, it was this PDF file that was later used as the basis for the "Version 2" forgery of the JVA.

76.    On July 14, 2013, the electronic version of the forged "Version 2" was created.  At 9:46 p.m., an unknown computer opened and modified a file named "P6 LA MF Holdings I LLC clean NS 123 PRINT.pdf"—a title identical to that of the PDF that Shekhter forwarded to Adam Shekhter two days earlier, but for the appended language "clean NS 123 PRINT."  Notably, the inclusion of "NS," Shekhter's initials, in the document title is confirmation that Shekhter created the PDF, as he commonly added his initials to documents he created, as discussed more fully below.  Upon

information and belief, the file was opened by Neil Shekhter on his home computer, called "DELLNEIL2012-PC," and edited with an Adobe Acrobat application to change the "five (5)" language in Section 11.1(a)(i) to read "three (3)." This alteration caused a single line of text—the line containing the fabricated term—to hang over the right-hand justification that exists in every other line of the page and the rest of the JVA. This telltale "overhanging g" was a crucial indicator of forgery.

### Changing "five" to "three" Causes A Single Overhanging Letter



Neil Shekhter's "DELLNEIL2012-PC" home computer was never produced during the Lincoln Studios Litigation despite a Court Order that it be produced and even though forensic examination later established that—contrary to Shekhter's perjurious testimony that he threw it away in late 2014/early 2015—it was still being used as late as September 19, 2015, *after* the court in the Lincoln Studios Litigation issued its Order requiring its production. On information and belief, Neil Shekhter still maintains possession of this computer to this day and concealed it from the Los Angeles Superior Court and from AEW.

77.    On July 15, 2013, at 1:24 p.m., the electronic "clean NS 123 PRINT" forgery was transferred from that same unknown computer (on information and belief, Shekhter's "DELLNEIL2012-PC") to a USB flash drive (also never produced by Shekhter or NMS despite a Court Order requiring its production) and subsequently opened on Adam Shekhter's NMS desktop computer at 3:51 p.m. "Version 2" was then printed by Adam Shekhter at NMS' offices on NMS' Xerox WorkCenter 7775

printer, Serial Number RFX001896.  After it was printed, "Version 2" was then scanned to Adam Shekhter's NMS' email account shortly after 4:00 p.m., eliminating all metadata that would have been associated with the PDF file (to conceal the origins of the forgery).

78.    The printed "Version 2"—which Shekhter repeatedly testified under oath was the "original" hard copy he received in September 2010—actually contains "CPS" code—an anti-counterfeiting code embedded by some office printers—that matches this timeline and location perfectly.  That is, the hard-copy document confirms that the hard copy that Shekhter claims was delivered to him by hand in 2010 was actually printed sometime between 3:00-4:00 p.m. on July 15, 2013 using the Xerox WorkCenter 7775 multifunction office machine, Serial Number RFX001896, at NMS' offices.[2]

**The CPS Code Found On "Version 2"**
**Confirms It Was Printed On July 15, 2013 At NMS' Offices**



_____

[2]  Additional forensic evidence confirmed that the printed "Version 2" was not a "original" hard copy from 2010 as Shekhter repeatedly swore.  For example, the printed "Version 2" also contains a CPS code on every page, but for one page—Mr. Samek's signature page.  This means that Mr. Samek's signature page on "Version 2" was removed and substituted with another signature page taken from another source and substituted into the document after it was first printed on July 15, 2013.  The fact that this page, the 79th page of the 120+ page Version 2, was substituted with an obviously older page from another document, likely evidences an attempt to make the signature line appear older if ink testing were performed.

79.    After scanning "Version 2" into the sanitized PDF file of the forgery, Adam Shekhter emailed this "CLEAN" file to his father, Neil Shekhter, at 4:51 p.m.

80.    After he received "Version 2" from his son Adam on July 15, 2013, Shekhter began circulating the forgery internally at NMS to make it appear that others had also always had a copy of the forgery.  A review of NMS' electronic server and devices, however, showed that no electronic copy of the "Version 2" forgery of the JVA ever existed on any NMS server or device before July 15, 2013.

81.    On July 18, 2013, just three days after creating, printing, and scanning the forged "Version 2," Shekhter began disseminating the forgery to third parties, including a Joint Venture lender.  That day, in furtherance of the scheme, Shekhter emailed a copy of the forged "Version 2" of the JVA to Andrew Lucca, in Arizona, and James Prouty of KeyBank, the federally insured lender for one of the Joint Venture's Properties.  In the email, Shekhter falsely represented that the forgery "is the version that I have executed in September 2010."  Of course, Shekhter knew the document attached to his email ("P6 LA MF Holdings I LLC 2 v.2.pdf") was a forgery and not what he executed in September 2010 because he and his son Adam had forged "Version 2" only days earlier.  Upon information and belief, Shekhter sent the forgery to KeyBank and knowingly misrepresented its authenticity with the intent that KeyBank would rely on it to the detriment of Plaintiffs, with the intent to defraud KeyBank into relying on "Version 2" as the operative JVA, and to create the appearance that "Version 2" had always been in KeyBank's files if AEW asked KeyBank for a copy of the JVA that KeyBank had in its files.

82.    On July 19, 2013, apparently in an attempt to provide cover for the sudden appearance of a 3-year Buy/Sell provision when the executed JVA always relied upon by the Joint Venture contained a 5-year Buy/Sell provision, Shekhter emailed a number of NMS employees, including Williford, the Buy/Sell formula (the later of three years or stabilization) that had been contained in the non-binding Term Sheet in May 2013, long before the parties had finalized their negotiations and

executed the JVA.  However, in response, Williford noted:  "***This concept did not make it into the actual LLC agreement***."

83.    Mere hours after Williford confirmed there was no 3-year Buy/Sell in the executed JVA, Shekhter directed Williford to email Flowers again on July 19, 2013, this time attaching a copy of the forgery, which he described as the "last version of the LLC Agreement that was approved by Neil [Shekhter], which was sent hard copy to our offices in September 2010 – with the buy-sell permitted after 3 years, which is consistent with the executed term sheet and the conversations of NMS and AEW over the last three years."  Williford later testified that Shekhter "ghost wrote" the email.  Shekhter knew, of course, that the document attached to Williford's email ("P6 LA MF Holdings I LLC v.2.pdf") was a forgery, but caused the forgery to be sent to AEW's counsel by email (along with additional false statements) in order to pressure AEW into selling Shekhter/NMS AEW's interest in the Joint Venture against its wishes and at a substantial discount.

84.    Williford's July 19, 2013 email was the first time AEW learned of the forgery.  Upon receiving the forgery, AEW took steps to determine its origins and concluded that nobody at AEW had ever seen it before, or even a draft of it.

85.    Also, on or about August 16, 2013, Williford emailed Tom Johnston of S&W, one of NMS' original deal counsel, attaching a copy of the forged "Version 2."  Copying Shekhter, Williford asked Johnston if he had "ever receive[d] a fully executed [copy] of this LLC Agreement (see attached) – whether via email or in hard copy by mail – from AEW or its attorneys?"  On information and belief, this email was sent at Shekhter's request in order to cause Johnston to rely on its authenticity, and also to place the "Version 2" forgery in yet another third party's files in case AEW asked him for a copy of the document that was in his files.

86.    Johnston, however, replied that until the transfer of the Property at 9901 Washington, "the original form of the P6 MF Holding I LLC Agreement was ***the LLC Agreement***.  We exchanged the original form of agreement as a copy P6 LA MF

Holdings I LLC Agreement **on multiple occasions**. . . .  On or about January 21, 2011 the 'Change Pages' regarding 'Specified Properties' were substituted into the PA LA MF Holding I LLC Agreement and presented to [a Joint Venture Lender] as **the true and correct copy** of the P6 LA MF Holding I LLC Agreement.  **Since January 21, 2011, the P6 LA MF Holding I LLC Agreement with the 'Change Pages' has been treated as the P6 LA MF Holding I LLC Agreement and presented as so on all transactions after January 21, 2011.**  I still have not found any correspondence evidencing your agreement to substitute the 'Change Pages' but **NMS has consistently certified that the P6 LA MF Holding I LLC Agreement with the 'Change Pages' is the P6 LA MF Holding I LLC Agreement on transactions after January 11, 2011**."  (Emphases added.)  In other words, Exhibit 2 to this Complaint, not the forged "Version 2," has been the operative JVA certified by NMS and relied upon by everyone since January 11, 2011.

87.    In September 2013, NMS informed AEW that it intended to submit the forgery to a third-party lender in connection with the refinancing of one of the Properties.  AEW challenged the authenticity of the forgery and warned NMS that if it submitted the forgery to the lender, such conduct would constitute an Event of Default under the JVA, which would be grounds for NMS' removal as the Operating Member of the Joint Venture.  NMS represented that it did not submit the forgery at that time, but continued with its fraudulent and extortionate scheme nonetheless.

88.    On or around November 18, 2013, in an email to Samek copying Williford, Margot Shekhter, and other NMS executives, Shekhter claimed that the January 2011 slipsheet pages containing the Specified Properties Amendments were not valid, contrary to his own admissions and conduct and that of NMS' counsel over the prior three years.  In this email, Shekhter claimed "I recently discovered that there are multiple copies of the LLC Agreement . . . that contain different terms" and "[a]pparently, the prior law firm for AEW 'slipped' pages into an iteration without my authorization."  Shekhter's goal was not only to lay the groundwork for using his

1   forgery but also to cast doubt on the authenticity and validity of the JVA that had been

2   submitted to and relied upon by numerous Joint Venture lenders and to further the

3   extortionate scheme.  NMS refused to certify the actual JVA to any more lenders,

4   paralyzing both AEW and the Joint Venture and its Subsidiary Companies, whose

5   clear title and authority were required for any future loan, re-financing or sale of the

6   Joint Venture Properties.  NMS was also seeking to fraudulently capture for itself all of

7   the financial benefit created by AEW's additional capital investment in the Joint

8   Venture Properties made only as a result of the Specified Properties Amendments to

9   the JVA.  Before these amendments were agreed upon (and incorporated into at least

10  five standalone executed amendments), NMS was required to put up 30% of the capital

11  compared to AEW's 70%, with the expectation that at some point NMS would obtain a

12  return based on its 30% capital contribution.  However, after the Specified Properties

13  Amendments, originally requested by NMS shortly after the execution of the JVA

14  because it was either unable or unwilling to meet its contractual obligation to fund

15  30% of the capital contributions, AEW invested 90% of the capital compared to 10%

16  from NMS.  After AEW had invested the additional capital in reliance on the amended

17  JVA, NMS was fraudulently trying to claim that it should get credit for a 30%

18  investment when it had only invested 10%.  This was on top of NMS' fraudulent

19  efforts to force AEW to sell its interest in the Joint Venture to NMS before the five-

20  year anniversary of the executed JVA, against its wishes, and at a time when AEW's

21  return would have been "capped" at far less than it was entitled to after the five-year

22  anniversary.

23      89.    On or around December 26, 2013, Williford again asked Johnston to

24  provide his "files for AEW."  Of course, there was no forgery in Johnston's actual

25  files.  Johnston's response attached the operative JVA as amended in January 2011,

26  along with all ten standalone amendments to the JVA, thereby confirming once again

27  that the JVA always had both a 5-year Buy/Sell term and the Specified Properties

28  Amendments.

**G.    To Further the Extortionate Scheme, Shekhter Files a Sham Complaint Based on the Forgery, and Repeatedly Lies Under Oath Regarding Its Origins and Authenticity.**

90.    On or about July 15, 2014, NMS Capital, Shekhter, and other affiliates (collectively, the "Lincoln Studios Plaintiffs")[3] filed suit against, *inter alia*, the Investor Member's former counsel, DLA and Seyfarth Shaw, in the Superior Court for the State of California for the County of Los Angeles, *Lincoln Studios, LLC, et al. v. DLA, et al.*, Case No. BC551551 (the Lincoln Studios Litigation).

91.    In early 2015, Shekhter submitted a detailed 22-page declaration in the Lincoln Studios Litigation describing—under oath—the negotiation, execution, and terms of the JVA, but making no mention whatsoever of "Version 2," any alleged typo leading to "Version 2," or any alleged 3-year Buy/Sell term.  Shekhter even specifically referenced the Article 11 Buy/Sell rights of the JVA, which was attached to another filing made by DLA, but made no challenge whatsoever to the 5-year Buy/Sell term contained in DLA's attached JVA.  Shekhter also declared that he spoke with Samek several times between September and October 2010, but again failed to even hint at the claim he would later make that AEW had allegedly sent "Version 2" to him in order to correct a typo, even though Shekhter spent several paragraphs in his declaration disputing the January 2011 Specified Properties Amendments.  In sum, despite addressing the Buy/Sell Provision and the supposed validity of the JVA in detail, Shekhter did not mention "Version 2" or any alleged 3-year Buy/Sell term a single time.  Apparently, Shekhter and his Co-Conspirators believed that AEW would

---

[3]  The full list of Lincoln Studios Plaintiffs is as follows:  Neil Shekhter, individually and as a Trustee of the NMS Family Living Trust Dated September 3, 1991 (2000 Restatement); Margot Shekhter, individually and as a Trustee of the NMS Family Living Trust Dated September 3, 1991 (2000 Restatement); NMS Capital Partners, LLC; NMS Capital Partners I, LLC; the NMS Family Living Trust Dated September 3, 1991 (2000 Restatement); Lincoln Studios, LLC; NMSLUXE375, LLC; NMSLUXE415, LLC; 9901 LUXE, LLC; and NMBROADWAY Studios, LLC.  Shekhter is alleged to be the principal of the Lincoln Studios Plaintiffs.

be compelled to sell its interest in the Joint Venture to NMS in order to "save" its former counsel and/or to avoid any possible intrusion into its attorney-client privilege, but Shekhter did not yet feel secure enough in his scheme to actually submit the forged "Version 2" to the Los Angeles Superior Court.  However, that quickly changed.

92.    On or about April 21, 2015, when it became clear that AEW still would not cave to the fraudulent and extortionate scheme being perpetrated by Defendants, Shekhter, Margot Shekhter, NMS Capital, and the other Lincoln Studios Plaintiffs authorized the filing of the First Amended Complaint ("FAC") in the Lincoln Studios Litigation, naming AEW and the Joint Venture as defendants—as well as AEW CM, AEW P6, Samek, and other affiliates (collectively, the "Lincoln Studios Defendants").[4]  In the FAC, the Lincoln Studios Plaintiffs alleged that the forged "Version 2" was the operative version of the JVA.  Specifically, they alleged (1) that at some point Neil Shekhter "noticed that Version 1 [the original executed JVA] appeared to contain a mistake, i.e., that the Buy/Sell provisions stated that the Buy/Sell procedure could occur after 5 years, instead of after 3 years"; (2) that Shekhter "contacted" Samek/AEW and that Samek/AEW "told" Shekhter that they would ask DLA "to revise Version 1 so that it stated 'Buy/Sell' could occur after 3 years, instead of after 5 years"; (3) that DLA and/or AEW subsequently "delivered a corrected operating agreement ('Version 2')"—i.e., the forgery—in September 2010; (4) that AEW "fabricated another version of the operating agreement (Version 3)"—i.e., the JVA as amended to include the Specified Properties—"by lifting [Shekhter's] signature from other documents and physically placing it into Version 3"; and (5) that "Version 3 was **not** authorized or executed by NEIL."  Based on these

_____

[4]  The full list of Lincoln Studios Defendants affiliated with the Joint Venture is as follows:  P6 LA MF Holdings SPE, LLC (the Investor Member), P6 LA MF Holdings I LLC (the Joint Venture), AEW Capital Management, L.P., AEW Partners VI, L.P., AEW Partners VI, Inc., AEW VI, L.P., Eric Samek, Marc Davidson, Lincoln Walk Studios, LP, Luxe Washington, LLC, Luxe La Cienega, LLC, and NMS Broadway, L.P.

1    allegations, the Operating Member purported to assert a claim for "Breach of Version
2    2."

3        93.    Each and every one of the foregoing allegations was knowingly false and
4    misleading.  The inclusion of the five-year Buy/Sell was not a "mistake," but was
5    expressly requested by NMS and its deal counsel.  Shekhter never contacted AEW or
6    Samek in 2010 to discuss any alleged "mistake" because there was no mistake, and
7    neither AEW nor Samek ever told Shekhter they would ask DLA to revise the JVA to
8    include the 3-year Buy/Sell or do so themselves.  Neither AEW nor DLA delivered a
9    copy of "Version 2" to Shekhter in 2010.  To the contrary, Neil Shekhter created
10   "Version 2" in July 2013.  And AEW did not forge the operative version of the JVA.
11   In fact, NMS and its counsel approved the Specified Properties Amendments and
12   Shekhter later certified that the JVA as amended in January 2011 was the true, correct,
13   and operative version of the JVA.  Defendants filed the FAC with its false allegations
14   and reliance on the forged "Version 2" not only to defraud the court, but also to further
15   their fraudulent and extortionate scheme against Plaintiffs.  The mere filing of the FAC
16   cast doubt on the validity of the JVA, the title to the Properties owned by the
17   Subsidiary Companies, and AEW's authority over any sale of the Joint Venture
18   Properties or re-financing of any Joint Venture Property loans.  As a direct result of the
19   filing of the FAC, AEW was expressly told by at least two title insurance companies
20   that it would not issue title insurance in connection with any Joint Venture Property
21   sale or loan, which meant that the Joint Venture Properties could not be sold or re-
22   financed unless AEW capitulated to Defendants' fraudulent and extortionate scheme or
23   prevailed in the sham Lincoln Studios Litigation.  It also meant that the Joint Venture's
24   Subsidiary Companies would almost certainly default on their existing loans in the not
25   too distant future unless they capitulated to the fraudulent and extortionate scheme or
26   prevailed in the litigation.

27       94.    The FAC was personally served on AEW and its affiliates (or the
28   registered agent of those entities), emailed by NMS' counsel, Steven Zelig, to AEW's

counsel at Gibson Dunn on or about April 30, 2015, and, on information and belief, forwarded by Defendants and their Co-Conspirators to various lenders and third parties with the intention that the third parties would rely upon the false allegations and forged "Version 2" to the detriment of Plaintiffs. On information and belief, the FAC was also sent to counsel for other defendants in the Lincoln Studios Litigation through email and mail via the U.S. Postal Service on or about April 21, 2015.

95.     On or about June 11, 2015, AEW filed an action in the Superior Court for the State of California for the County of Los Angeles, seeking the removal of NMS Properties as the property manager of the Joint Venture's Properties. *See P6 LA MF Holdings I LLC, et al. v. NMS Properties, Inc.*, Case No. BC 584878 (the "Property Management Litigation"). On that same day, AEW applied for a temporary restraining order and an order to show cause why a preliminary injunction should not issue. On June 19, 2015, in the process of briefing the Motion for Preliminary Injunction in the Property Management Litigation, and in furtherance of the fraudulent and extortionate scheme, Shekhter submitted a perjurious declaration which attached and purported to authenticate the forged "Version 2" JVA. The declaration contained numerous false and misleading statements, including the following:

> 5.     Although the first version of the JVA was not delivered to me as required and therefore is of no effect, I executed the signature pages electronically believing I had the right to acquire the interests of AEW within 5 years and as of the 3 year anniversary as I had repeated advised Samek and Davidson. After my signature pages were affixed to the first version of the JVA, I noticed that the first version appears not to allow for a Buy/Sell until after year five years of the Venture. I brought this to Mr. Samek's attention. He said he would correct this, and a second version of the JVA, with the same signed pages, was delivered to my office. I understand that AEW claims I agreed to a third version that is worse for me than the first and second, which I absolutely did not do. . . .

> 6.     I have reviewed the document attached as Exhibit A to the Declaration of Marc L. Davidson dated June 10, 2015 entitled "Limited Liability Company Agreement for P6 LA MF Holdings I LLC" and referred to in the Davidson Declaration as the "JV Agreement." I never approved, executed or otherwise agreed to that JV Agreement. Nor did any other authorized agent of NMS Capital Partners I, LLC; I know this to be the case because no one but me had the authority to approve a document like this for NMS Capital Partners I, LLC. The signature page (p. 79) in Exhibit A appears to have been signed by me, but, in fact, that

signature page had to have been taken by AEW from a prior version of Exhibit A and physically placed within the alleged version without my permission. . . .

7.      As I read the different JVA, the second version most closely reflects the buyout/ acquisition rights to which I and Mr. Samek had agreed. Attached hereto as Exhibit A is a true and correct copy of that version.

On or about June 22, 2015, Miller and Zelig, counsel for NMS, acting on behalf of NMS Properties, caused the perjurious declaration to be sent through the U.S. Postal Service and facsimile to AEW's counsel at Gibson Dunn.

96.      Each and every one of the foregoing allegations was knowingly false and misleading.  NMS specifically requested and negotiated for the inclusion of a 5-year Buy/Sell, and the Buy/Sell Provision in the executed JVA contained no mistake.  In fact, both Shekhter and Margot Shekhter repeatedly affirmed the validity of the January 2011 Specified Properties Amendments, through both written confirmation and its conduct.  And Shekhter knew, of course, that "Version 2," which he attached as Exhibit A to his declaration, was a forgery because he created it.  Upon information and belief, Shekhter, Margot Shekhter, the other Defendants, and the Co-Conspirators authorized and directed the filing of this false and misleading declaration for the purpose of causing reasonable fear of economic loss of the part of Plaintiffs and with the intent that the court would rely on the false and misleading allegations to the detriment of Plaintiffs.

**H.      Shekhter Creates a Second Forgery to Perpetuate the Extortionate Scheme by Preventing NMS Properties' Removal as Property Manager**

97.      NMS Properties was originally retained as the property manager pursuant to a Property Management Agreement (PMA) with each Subsidiary Company.  The JVA requires in Article 1 that all PMAs be "cancellable, without penalty or fee, upon thirty (30) days written notice."  Pursuant to Section 8.4 of the JVA, PMAs could only be terminated or modified by AEW or with the prior written approval of AEW.  The

parties also negotiated and agreed to a Form PMA at the same time that the Joint Venture was negotiated and executed, which set forth in detail all of the material terms that the PMAs were required to contain. Section 12 of the Form PMA (and all subsequent valid PMAs) allowed the PMAs to be terminated by AEW (1) upon 30 days' written notice, without cause or penalty (the "30-day notice provision"); (2) immediately, without cause, with the payment of a termination fee; (3) immediately, with cause; *and* (4) immediately, upon sale or transfer of the Property.

98. On or about May 6, 2015, AEW, on behalf of the Subsidiary Companies, sent NMS Properties written notice that it was being terminated as the property manager of the Properties after no less than 30 days pursuant to the 30-day notice provision (the "PM Termination Notice").

99. On or about May 26, 2015, AEW, on behalf of the Subsidiary Companies, notified NMS Properties that it would be terminated as of June 10, 2015, a date more than 30 days after the PM Termination Notice was sent.

100. However, on June 10, 2015, the properly noticed termination date, NMS Properties failed to comply with its obligations upon termination.

101. On or about June 11, 2015, AEW filed the Property Management Litigation seeking the removal of NMS Properties as property manager of the Properties pursuant to the valid termination of the PMAs. *See P6 LA MF Holdings I LLC, et al. v. NMS Properties, Inc*., Case No. BC 584878. On that same day, AEW applied for a temporary restraining order and order to show cause why a preliminary injunction should not issue. AEW's chief ground for removal was the 30-day notice provision in the Form PMA that was required to be in every PMA (and it was in every PMA in Plaintiffs' possession), which allowed for the termination of NMS Properties at each Property without cause merely upon the provision of 30 days' written notice.

102. As described above, Shekhter and NMS Properties submitted and purported to authenticate the forged "Version 2" JVA in the Property Management

Litigation, copies of which were mailed by Defendants and their Co-Conspirators to Gibson Dunn, and on information and belief to various other third parties.  This was not the only forgery created and relied upon by Defendants in the Property Management Litigation and the Lincoln Studios Litigation.

103.  On or about June 23, 2015, the Los Angeles Superior Court in the Property Management Litigation conducted a lengthy hearing on AEW's request for a preliminary injunction—a request that had been extensively briefed over the previous two weeks.  At the hearing on that motion and in connection with the briefing, Defendants submitted only a single PMA—for 1410 5th Street—which contained all of the required termination provisions, including the 30-day notice provision.

104.  On or about June 24, 2015, the Los Angeles Superior Court granted AEW's motion for a preliminary injunction based upon the proper termination of NMS Properties pursuant to the 30-day notice provision.  Apparently recognizing that this Order was imminent, however, at around 7:00 in the morning just prior to the Order being issued, Shekhter and his Co-Conspirators began creating the second forgery at issue, a forged PMA for the La Cienega Property owned by one of the Joint Venture Subsidiary Companies.

105.  On June 24, 2015, the morning after the hearing, sometime between 7:00 a.m. and 7:30 a.m., Shekhter began receiving (and possibly forwarding to himself) emails from the accounts of current and former NMS employees containing Word and PDF versions of older PMAs for the Lido and Washington Properties owned by the Joint Venture, each of which contained the standard 30-day notice provision.  Shortly thereafter, at around 7:40 a.m., the Los Angeles Superior Court notified the parties that it had granted AEW's request for a preliminary injunction.  At around 8:00 a.m., on information and belief, Shekhter created a new Word file on his home computer called "Property Management – 375 ns.doc."  "375" was the street number for the La Cienega Property, and "NS" are Shekhter's initials, which, as described above, Shekhter commonly includes in the title of documents he creates.  On information and belief,

Gibson, Dunn & Crutcher LLP

Shekhter created this Word file by first saving or copying an older Word file for the Lido Property that had been emailed to Shekhter less than an hour earlier. Shekhter then edited the new Word file to change the 30-day no cause termination language in Section 12.1 into a 60-day no cause termination provision, and to delete the right to terminate the PMA immediately upon payment of 30 days' worth of Property Management fees; he also made other changes to the document to make it appear, falsely, that the document had been amended in a number of ways after negotiation (a negotiation that never took place). On information and belief, Shekhter then printed out the forged La Cienega PMA and scanned it, subsequently emailing the forgery to his counsel at about 9:00 a.m.[5]  Shortly thereafter, just before 10:00 a.m., Shekhter's counsel gave *ex parte* notice via email of Defendants' intention to appear *ex parte* the next morning to seek reconsideration of the injunction order.

106.   However, Shekhter botched his initial forgery. The scanned file relied upon by Shekhter and his attorneys as the basis of their 10:00 a.m. *ex parte* notice contained a cover page showing that this PMA was for a different "owner." Rather than containing the name of the Subsidiary Company that owned the La Cienega Property, the botched forgery still included the name of the owner of the Lido Property on which the forgery was based. This was so even though Shekhter had changed the name of the Property in the botched forgery to the La Cienega Property.

**The Botched Forgery Listed The Wrong Owner**



| MANAGEMENT AGREEMENT | |
|---|---|
| PROPERTY NAME: | LUXE LA CIENEGA |
| OWNER: | 1410 5th STREET, LLC |
| MANAGER: | NMS PROPERTIES |
| DATE: | MARCH 01, 2012 |

[5]  While the court in the Lincoln Studios Litigation found that Shekhter's emailing of the botched forgery to his counsel was not privileged, it also found, in the alternative, that even if the contents of the email had been privileged, "any such privilege . . . has been lost pursuant to the crime-fraud exception to the attorney-client privilege."

Gibson, Dunn & Crutcher LLP

107.    The botched forgery could never have existed, of course, because the owner of the La Cienega Property was never the same owner of the Lido Property, and the Lido PMA, executed years before the La Cienega PMA was drafted, was not the basis for the La Cienega PMA that was circulated among and approved by AEW and NMS in 2012.  The actual La Cienega PMA was drafted and circulated by AEW's counsel in an email to NMS and its counsel on January 25, 2012, and was expressly approved by NMS' John Colletti by email on January 26, 2012, and subsequently emailed by AEW's counsel to the lender on January 27, 2012.  The actual La Cienega PMA circulated and approved in January 2012 contained the required 30-day no cause termination provision in Section 12.1 and should have been executed and maintained by NMS after that.  The approved draft La Cienega PMA in 2012 was based on a later version of the PMAs than the one on which Shekhter's forged La Cienega PMA was based, and did not include several typos and formatting errors that had been included in the Lido PMA on which Shekhter based his forged La Cienega PMA.  Thus, the formatting errors and typos contained in the forged La Cienega PMA only exist because Shekhter relied on a Word version of an older PMA.

108.    Later that night, Shekhter and/or his Co-Conspirators must have discovered their mistake (the wrong owner name) because Shekhter emailed a new, corrected forged La Cienega PMA to himself at or around 11:22 p.m. that night.  The corrected forgery included the correct owner's name, though still included the typos and formatting errors.

109.    The next morning, June 25, 2015, Neil Shekhter attached the "corrected" forged La Cienega PMA to his declaration in support of NMS' *ex parte* application.  Shekhter never mentioned the initial botched forgery and swore that he was "unable to locate" any PMAs prior to the preliminary injunction hearing except those previously filed.  Notably, the botched forgery was never produced by Defendants or their counsel despite a Court Order that all such documents be produced; it was only discovered through a court-ordered forensic examination of NMS devices.  On or around July 9,

2015, in the course of further briefing ordered by the court in the Property Management Litigation as a result of Shekhter's submission of the forged La Cienega PMA, Shekhter submitted a supplemental declaration reaffirming the forgery and elaborating his perjurious story behind the forgery, falsely declaring "I did have discussions with the Investor Member about having a no-less-than 60-day termination provision for La Cienega" and "the Investor Member agreed to a termination period to [sic] 60 days." Shekhter knew this sworn statement was not true, as he himself created the forged La Cienega PMA only days earlier for the very purpose of overturning the preliminary injunction granted in this matter. On or around July 9, 2015, Shekhter's counsel emailed Shekhter's July 9, 2015 declaration to Gibson Dunn.

110. The purpose of the forged La Cienega PMA and its submission to the Court was to defraud the court into withdrawing its order compelling NMS Properties to vacate the Joint Venture Properties as part of Defendants' fraudulent and extortionate scheme against the Plaintiffs, and also to allow Defendants to continue to convert Plaintiffs' rents for their own benefit. After receiving the forged La Cienega PMA the court did withdraw its order compelling NMS to vacate the Joint Venture Properties and NMS refused to vacate the Joint Venture Properties throughout 2015 and 2016, preventing Plaintiffs from selling or refinancing the Properties, causing several of the Joint Venture Property loans to go into default, and also preventing the Joint Venture and Subsidiary Companies from accessing books and records, bank accounts, or the Properties themselves.

111. Notwithstanding the forgery, on or about August 13, 2015, all of the Subsidiary Companies again issued termination notices to NMS Properties, terminating all PMAs pursuant to the 30-day notice provision (effective as of September 14, 2015) and, without waiving their rights to challenge the forged La Cienega PMA, also terminating the La Cienega PMA by providing 60 days' notice as specified in the forgery (effective as of October 15, 2015).

112.   NMS Properties, however, still refused to vacate the Properties or comply
with its termination obligations.  These obligations included, but are not limited to,
delivering the following to the Subsidiary Companies that own the Properties:  (1) a
"final accounting, reflecting the balance of income and expenses" of the Properties; (2)
"[a]ny balance of monies of Owner or tenant security deposits, or both, held by
Manager with respect to the Propert[ies]"; and (3) all "records, contracts, leases, tenant
correspondence, files," and all other "information which pertain in any way to the
Propert[ies]."

113.   Despite having been properly terminated as of June 10, 2015, NMS
Properties, under the direction and control of its CEO Shekhter and its President
Margot Shekhter, has continued to collect rents for all Properties except 9901
Washington (which it vacated on the eve of the preliminary injunction hearing
apparently to enhance its "credibility" with the court with respect to the other Joint
Venture Properties that were actually collecting millions of dollars in rent, unlike 9901
Washington which was still being constructed), continued to hold itself out as the valid
property manager at all Properties, refused to surrender the rents it collected after being
terminated, and refused to provide access to the Properties' books and records.  NMS
did these things to further the extortionate scheme to inhibit the sale of the Properties.
Pursuant to Sections 12.3 and 12.4 of the PMAs, all rents and monies collected by
NMS Properties following the effective date of its termination up until the sale belong
to the Joint Venture and Subsidiary Companies.  NMS Properties has no right to retain,
withhold, spend, or otherwise control any money it wrongfully collected while holding
itself out as property manager.  As a result of NMS' misconduct, Plaintiffs have been
harmed.

**I.    Defendants Continue to Prosecute the Sham Lincoln Studios
Litigation and Rely Upon the Forged "Version 2"**

114.   Even as Defendants created and advanced a new forgery in the Property Management Litigation, Defendants continued to advance and rely upon the forged "Version 2" in the Lincoln Studios Litigation.

115.   On or about September 10, 2015, in furtherance of their fraudulent and extortionate scheme, Shekhter, Margot Shekhter, NMS Capital, and the other Lincoln Studios Plaintiffs filed a Second Amended Complaint ("SAC") in the Lincoln Studios Litigation, emailed a copy to Gibson Dunn and counsel for other defendants in the Lincoln Studios Litigation, and mailed a copy through the U.S. Postal Service to the same.  In the SAC, the Lincoln Studios Plaintiffs (including Shekhter and Margot Shekhter) continued to advance and rely upon the forged "Version 2," repeating the same knowingly false and misleading allegations they made in the FAC regarding its origins and authenticity, and continuing to assert a sham claim for breach of contract based on the forged 3-year Buy/Sell Provision.  Upon information and belief, Defendants authorized and directed the filing of the SAC even though they knew its allegations were false and misleading.  Defendants filed the SAC with the same intentions and goals as the FAC—to defraud the court, to further the fraudulent and extortionate scheme against Plaintiffs, to prevent the sale or refinance of the Properties unless AEW capitulated to their extortion, and to induce the court and third parties to rely on the false allegations and forged "Version 2" to the detriment of Plaintiffs.

116.   On or about September 17, 2015, Shekhter, Margot Shekhter, and NMS Capital verified supplemental interrogatory responses in the Lincoln Studios Litigation ("Responses").  The Responses further rely upon the forged "Version 2," despite the fact that Shekhter created the forgery and after having repeatedly been put on notice of its fabrication.  In fact, Shekhter, Margot Shekhter, and NMS Capital purport to attach "a true and correct copy of Version 2" as an exhibit to the Responses, which were sent

by email on or around September 17, 2015 from Zelig to Gibson Dunn, and later by U.S. Mail and fax on or around October 1, 2015 from Zelig to Gibson Dunn.

117.    On or about September 28, 2015, in furtherance of the fraudulent and extortionate scheme, Neil Shekhter submitted a perjurious declaration in the Lincoln Studios Litigation.  Specifically, in Paragraph 13, Shekhter stated that "'Version 1' [the original executed JVA] appeared not to allow for a buy-sell until after year five, instead of after 3 years," that Shekhter "brought this to Mr. Samek's attention," and that Samek "acknowledged that the provision was inaccurate and he would correct same."  Shekhter stated that "Version 2 arrived at my office accompanied by a letter (on 'AEW' letterhead, signed by Mr. Samek) dated September 14, 2010."  In Paragraph 14, Shekhter stated that he "carefully maintained the original hard copies of Version 2 and Mr. Samek's September 14, 2010 cover letter for it."  The sworn statements were knowingly false and misleading for the reasons set forth in Paragraphs 72-89 and 123-138, *supra*.  On or about September 28, 2015, Miller and Zelig, acting on behalf of Shekhter, NMS Capital, and the other Lincoln Studios Plaintiffs, caused the perjurious declaration to be mailed through the U.S. Postal Service to Gibson Dunn and counsel for other defendants in the Lincoln Studios Litigation.

118.    On or about January 13, 2016, in furtherance of the fraudulent and extortionate scheme, Shekhter, Margot Shekhter, NMS Capital, and the other Lincoln Studios Plaintiffs filed a Third Amended Complaint ("TAC").  In the TAC, they purported to change their theories of recovery to rely on Article 6 of the JVA, but continued to advance and rely upon "Version 2," alleging, *inter alia*, that AEW/Samek "created" "Version 2" "to correct a mistake in 'Version 1,' relating to Article 11," and that Samek "falsely accused [Shekhter] of fabricating Version 2 of the JVA."  For the reasons set forth in Paragraphs 72-89 and 123-138, *supra*, these allegations were knowingly false and misleading.  Upon information and belief, Defendants authorized and directed the filing of the TAC even though they knew these allegations were false and misleading.  On or about January 13, 2016, Miller and Zelig, acting on behalf of

Shekhter, Margot Shekhter, NMS Capital, and the other Lincoln Studios Plaintiffs, caused the TAC to be emailed and mailed through the U.S. Postal Service to Gibson Dunn and, on information and belief, to counsel for other defendants in the Lincoln Studios Litigation.  Defendants filed the TAC with the same intentions and goals as the FAC and SAC—to defraud the court, to further the fraudulent and extortionate scheme against Plaintiffs, to prevent the sale or refinance of the Properties unless AEW capitulated to their extortion, and to induce the court and third parties to rely on the false allegations and forged "Version 2" to the detriment of Plaintiffs.

119.   Just as the court had sustained the Lincoln Studios Defendants' previous demurrers in the Lincoln Studios Litigation, on June 8, 2016, the court sustained their demurrers to the TAC, this time with prejudice.  The court rejected the Lincoln Studios Plaintiffs' attempt to change their theory of recovery, calling it a violation of the sham pleading doctrine in an attempt to walk away from the forged "Version 2."  The court further rejected the TAC's new Article 6 theory on the basis that, on its face, Article 6 of the JVA was not even "reasonably susceptible to plaintiff[s'] alleged interpretation." The court held that Article 6 "does not provide [NMS] with a right to monetize, buy-out, or take-out [AEW's] rights as alleged."

120.   On or about January 19, 2016, in furtherance of their fraudulent and extortionate scheme, Neil Shekhter submitted another perjurious declaration in the Lincoln Studios Litigation, again relying on the forged "Version 2" in an attempt to justify a forensic examination of the Lincoln Studios *Defendants'* devices. Specifically, in Paragraphs 11 and 12 of the declaration, Shekhter stated:  "Once I received the full version of the JVA, I saw that Section 11 granted a 'Buy/Sell' right five years after formation of the Joint Venture, as opposed to three years to which we agreed.  I brought the error to Mr. Samek's attention, and Mr. Samek said that he would fix it.  Mr. Samek fixed the mistake and sent me "Version 2" of the JVA . . . ." These sworn statements were knowingly false and misleading.  On or about January 19, 2016, Miller, acting on behalf of Shekhter, NMS Capital, and the other

Lincoln Studios Plaintiffs, caused the perjurious declaration to be sent via overnight delivery to Gibson Dunn and, on information and belief, to counsel for other Lincoln Studios Defendants.

121.    On or about January 27, 2016, in furtherance of their fraudulent and extortionate scheme, Neil Shekhter submitted another perjurious declaration in the Lincoln Studios Litigation, this time relying on the forged "Version 2" in an attempt to justify sanctions against the Lincoln Studios Defendants for rejecting the forgery. Specifically, in Paragraphs 7 and 8 of the declaration, Shekhter stated: "Once I received the full version of the JVA, I saw that Section 11 granted a 'Buy/Sell' right five years after formation of the Joint Venture, as opposed to three years to which we agreed. I brought the error to Mr. Samek's attention, and Mr. Samek said that he would fix it. Mr. Samek fixed the mistake and sent me Version 2 of the JVA . . . ." These sworn statements were knowingly false and misleading. On or about January 27, 2016, Miller, acting on behalf of Shekhter, NMS Capital, and the other Lincoln Studios Plaintiffs, caused the perjurious declaration to be emailed and mailed through the U.S. Postal Service to Gibson Dunn.

122.    Each and every one of the foregoing allegations was knowingly false and misleading, as discussed in Paragraphs 72-113, *infra*. Shekhter knew, of course, that "Version 2" was a forgery because he created it. Upon information and belief, Shekhter, Margot Shekhter, Defendants, and the Co-Conspirators authorized and directed the filing of these false and misleading declarations for the purpose of causing reasonable fear of economic loss on the part of Plaintiffs, to further the extortionate scheme against Plaintiffs, and with the intent that the court would rely on the false and misleading allegations to the detriment of Plaintiffs.

**J.    Shekhter Forges a Third Document to Further Defendants' Fraudulent and Extortionate Scheme**

123.    While Defendants were advancing the forged "Version 2" and the forged La Cienega PMA, they forged yet another document to bolster the purported

authenticity and legitimacy of "Version 2" after Plaintiffs' counsel provided Defendants' counsel with the July 28, 2010 Chernove comments to the draft JVA, which alone were sufficient to prove that "Version 2" was a forgery. On or about September 21, 2015, Defendants proffered for the very first time what they claimed to be a September 14, 2010 "cover letter" that Samek had allegedly delivered to Shekhter with the alleged hard copy of "Version 2" that Shekhter claimed to have received (the "Cover Letter"). Notably, Defendants and their Co-Conspirators presented this third forgery for the first time only at Samek's deposition in September 2015, never having mentioned it before despite years of litigation and dispute over the forged "Version 2."

124. The Cover Letter is yet another forgery created by Shekhter and his Co-Conspirators in furtherance of Defendants' fraudulent and extortionate scheme. The forged Cover Letter was created on or about June 21, 2015, only six days after Plaintiffs' counsel provided counsel for the Lincoln Studios Plaintiffs with a copy of the July 2010 Chernove comments to the draft JVA. Forensic examination of NMS' devices established that on or about June 21, 2015, Neil Shekhter emailed himself a PDF copy of the Cover Letter. This was the first time that the document ever appeared on any of Defendants' electronic devices that were produced in the Lincoln Studios Litigation. The metadata associated with the PDF attached to Shekhter's email to himself indicated that the PDF was created on "September 21, 2010." However, forensic examination established that it was impossible that the alleged September 21, 2010 creation date could have been accurate because ***the PDF software used to create the PDF that Shekhter emailed to himself did not exist until December 2014, four years after the Cover Letter was purportedly created***. Forensic evidence established that Shekhter created the false metadata by setting back the clock on his 2013 Dell computer to September 21, 2010 and then loading the forgery onto his 2013 Dell computer while the clock was set back to a false date; on information and belief Shekhter created the forged Cover Letter on his 2012 Dell home computer (DELLNEIL2012-PC) before loading it onto his 2013 Dell computer.

125.    Forensic evidence uncovered in the Lincoln Studios Litigation also showed that Shekhter emailed the forged Cover Letter to various employees of NMS in order to get them to test whether or not they could determine the true creation date. For example, on September 9, 2015, Shekhter sent an email to an employee asking if she "can tell when the original was taken or scanned," and on September 18, 2015 Shekhter sent an email to the IT Administrator of NMS asking him to "[p]lease take a look at metadata."  In response to the second email, NMS' IT Administrator sent to Shekhter an application called ExifTool—a powerful metadata analysis program capable of editing and removing metadata from files.  On information and belief, Shekhter was attempting to evaluate the reliability of the forged file and whether his fabrication of the file could be detected.

## The "Cover Letter" Is Another Forgery



Ultimately, NMS produced only a fourth version of the Cover Letter in the Lincoln Studios Litigation—one scrubbed of all embedded metadata regarding the date of its creation, and one that was clearly not a first-generation document.

126.    The forged Cover Letter soon made its way into Shekhter's sworn statements in the Lincoln Studios Litigation.  On or about September 28, 2015, in furtherance of their fraudulent and extortionate scheme, Neil Shekhter submitted a declaration attaching a copy of the forged Cover Letter.  In Paragraphs 13 and 14 of his declaration, Shekhter falsely represented that in September 2010, "Version 2 arrived at

my office accompanied by a letter (on 'AEW' letterhead, signed by Mr. Samek) dated September 14, 2010," and that he (Shekhter) "carefully maintained the original hard copies of Version 2 and Mr. Samek's September 14, 2010 cover letter for it." These representations were false and misleading. Shekhter repeated these knowingly false and misleading statements (and submitted the forged Cover Letter) at least three more times in the Lincoln Studios Litigation. On or about September 28, 2015, Miller and Zelig, acting on behalf of Shekhter, NMS Capital, and the other Lincoln Studios Plaintiffs, caused the perjurious declaration to be mailed through the U.S. Postal Service to Gibson Dunn and, on information and belief, to counsel for other defendants in the Lincoln Studios Litigation.

127. Upon information and belief, Shekhter, Margot Shekhter, the other Defendants, and the Co-Conspirators forged the Cover Letter, submitted it to the Los Angeles Superior Court (and, along with the other forgeries, to the California Court of Appeal), and mailed it to Plaintiffs' counsel (and, on information and belief, to other third parties) in order to defraud the courts and others into relying on the forged Cover Letter and the forged "Version 2" they claimed to substantiate to the detriment of Plaintiffs and to force Plaintiffs to capitulate to Defendants' fraudulent and extortionate scheme or face the potential of financial ruin, beginning with the default on various Joint Venture Property loans.

**K.    In Furtherance of the Fraudulent and Extortionate Scheme, Defendants Destroy and Alter Evidence of the Forgeries**

128. On September 8, 2015, the Los Angeles Superior Court in the Lincoln Studios Litigation ordered the Lincoln Studios Plaintiffs, including Shekhter, NMS Capital, and Margot Shekhter, to "immediately take steps to freeze all of their electronic documents so that they cannot be modified or deleted." Then, on October 6, 2015, the court ordered a forensic examination of the Lincoln Studios Plaintiffs' relevant electronic media, and ordered the Lincoln Studios Plaintiffs to produce for forensic imaging all of their devices and the devices of their affiliates that "could have

ever sent, received modified, opened, altered, or otherwise would have been used to view any copy of the JVA (including 'Version 2'), Exhibit 41 [the Cover Letter], and all Property Management Agreements (including the Luxe LA Cienega PMA), as well as Mr. Shekhter's home and office computers (the 'Devices')."

129.  On or about October 15, 2015—one day before Shekhter's and the other Lincoln Studios Plaintiffs' deadline to comply with the court's forensic examination order—Neil Shekhter's son Alan searched Google for ways to avoid compliance with the court-ordered forensic examination and to wipe the subject computers clean.  His search terms included:  "***secure wipe hard drive***," "***backdated secure wipe***," "***los angele[s] anti-computer forensics***," and "***how to avoid computer forensics***."

### NMS Employees Conspire to Permanently Delete and Wipe Devices Prior To The Court-Ordered Forensic Examination



/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

130.    On October 15, 2015, Neil and Alan Shekhter then engaged in a text message exchange (which Neil later deleted from his phone in violation of the court's orders) outlining in excruciating detail Shekhter and Alan's plan to remove the hard drive from Shekhter's computer (Shekhter's 2013 Dell computer, as Defendants never produced Shekhter's 2012 Dell computer), replace it, and backdate the computer and load it with files to make it look like the files had always been there, all before any forensic examination took place despite the court's freeze order.



*Excerpt

131.    That is exactly what they did.  That same day, Neil and Alan Shekhter initiated and executed their plan to:  (i) remove the hard drive from the home computer that Neil used in 2014-2015 ("Neil's New Home Computer"); (ii) replace it with a new hard drive that looked similar to the old one; (iii) manipulate and alter the computer by artificially backdating the computer's clock to make the files appear older than they were; and (iv) flood the new hard drive with more than 75,000 backdated files and folders.[6]  They accomplished each of these illegal tasks, causing the permanent loss of untold evidence and metadata.  Once Shekhter was caught in this astonishing act of evidence spoliation, he perjured himself in a further to attempt to justify his actions.  Shekhter submitted a declaration to the court in the Lincoln Studios Litigation swearing under oath that he and Alan Shekhter replaced the hard drive in Neil's New Home Computer for the sole purpose of deleting "private personal pictures of my wife [Margot]."  This was a lie.  The hard drive swap resulted in the deletion of relevant documents, spreadsheets, and PDF files with file names directly implicating the Joint Venture—not pictures of Margot Shekhter.

132.    Then, on or about December 2, 2015, two days before the court-ordered imaging of the Lincoln Studios Plaintiffs' computers, Shekhter and/or his Co-Conspirators manually installed a new operating system on Neil's New Home

_____

[6]  Critically, Neil picked the backdating date of January 10, 2015.  This was no accident, as that date coincided with Neil's false testimony as to when he allegedly "threw away" his 2013 home computer ("Neil's 2013 Home Computer") and "copied information from [it] to the new one."  Specifically, Neil testified that he "threw [the 2013 computer] away" sometime in late 2014 or early 2015 by "put[ting] it in the trash," despite his obligation to preserve all evidence.  The forensic review ordered by the court, however, later showed that Neil's 2013 Home Computer was still being used as late as September 19, 2015, just days after the court's September 8 order mandating a freeze of all data.  In short, Defendants not only misrepresented the availability of Neil's 2013 Home Computer (which was still in use as of September 2015 and not "thrown away" in January 2015), but then—in altering Neil's New Home Computer by removing a hard drive from that computer, replacing it, and backdating it—tried to make it appear that Neil's perjury about his 2013 Home Computer was true.  This constituted both the destruction and fabrication of evidence.

Computer.  The installation required an affirmative, manual upload or use of a Windows 10 DVD.  The installation of the new operating system made thousands of changes to the file system metadata on the computer, which further compromised Plaintiffs' forensic examination of the computer.

133.   That same day, a folder called "AEW" was renamed and many of its contents—including a subfolder called "AEW\AEW Docs\From AEW\09 21 2010\AEW v2 Letter" (which was almost certainly a copy of the forged Cover Letter)—were deleted from Neil's New Home Computer.

134.   The Lincoln Studios Plaintiffs' intentional destruction and concealment of evidence of the forgeries did not end there.  The Lincoln Studios Plaintiffs also withheld or destroyed several USB external storage devices used on Neil's New Home Computer.  In total, at least 21 devices that were connected to Neil's New Home Computer in the six months prior to the forensic examination began were never produced.  This is in addition to more than a dozen other electronic devices either destroyed, concealed, or otherwise manipulated by Shekhter and the other Lincoln Studios Plaintiffs.

**Devices Destroyed, Manipulated, or Withheld by Defendants and their Co-Conspirators**



Neil Shekhter 2012 Computer (DELLNEIL2012-PC)

Dell OptiPlex 7010 (Adam Shekhter NMS Dell Desktop)

PNY USB Drive (Used to transfer "NS clean 123 PRINT.pdf")

New Shekhter Dell Desktop Computer (NEIL5810-PC)

Seagate 4 terabyte drive (Original Seagate Secondary Hard Drive)

Seagate BUP Slim BK USB (used in backup of New Shekhter Dell Desktop)

Seagate 4 terabyte drive (Replaced Seagate Secondary Hard Drive)

**20 Other USB Devices**

Gibson, Dunn & Crutcher LLP

135.    Between the period of October 4, 2015 and December 4, 2015, during which the Lincoln Studios Plaintiffs were subject to the court's freeze order, the computer clock on Neil's New Home Computer was manually changed seventeen times, resulting in the manipulation of over 800,000 files and folders and making forensic examination many times more difficult than it otherwise would have been.  In fact, the last time Neil's New Home Computer was backdated was the very night that Plaintiffs conducted the court-ordered forensic examination, up until mere minutes before Plaintiffs' expert arrived at NMS' offices, all while the Lincoln Studios Plaintiffs' own computer expert, Neil Shekhter, his son, Alan, and NMS' IT Administrator were all there.

136.    Other NMS employees participated further in the Lincoln Studios Plaintiffs' intentional destruction and alteration of evidence.  For example, in December 2015, just days before the forensic imaging of NMS' computers, Enrique Sanchez, the IT Administrator at NMS, searched for "*file deletion utility windows 7*," and "*free SSD secure erase*."  He then downloaded an application called "Eraser Portable," which is a computer data destruction and wiping application, and on December 4, 2015, the application was copied to the NMS corporate file server.  This data wiping utility was used by both Enrique Sanchez and by another NMS employee, Brian Bowis (then Vice President for Finance at NMS), on the day the court-ordered imaging was to occur.  Bowis confirmed under oath that he used the Eraser Portable software to delete files relevant to the parties' dispute.  That same day, Sanchez also ran a confirming search—"*does eraser work on ssd?*"  Nor were these searches unique.  After the court ordered preservation, Sanchez searched for "*wipe multiple hard drives simultaneously*," "*hard drive destruction service*," and "*hard drive destruction service los angeles*."

137.    Sanchez also searched for "*Adobe Acrobat removal tool*" on November 13, 2015, and Adobe Acrobat was deleted sometime after October 2, 2015 from Adam Shekhter's computer, which had been the host of one of the forged

versions of the JVA.  This same computer was concealed from forensic examination by being taken offline and unplugged only 24 hours before the forensic examination took place.  Equally egregious, on December 3, 2015, Eddie Valentin, whom Defendants' counsel described as Neil Shekhter's assistant of "many years," deleted a copy of the forged La Cienega PMA from his NMS computer.

138.   Defendants and their co-conspirators took these heinous actions—replacing the hard drive on Neil's New Home Computer, backdating Neil's New Home Computer, installing a new operating system on Neil's New Home Computer, deleting and concealing the folders and subfolders relevant to the forgeries, lying about the existence of Neil's 2013 Home Computer, downloading and using computer data destruction and wiping applications, deleting applications used to create the forged documents, and deleting copies of the forged documents—to further the fraudulent and extortionate scheme.  Defendants' criminal conduct was intended to conceal and destroy incriminating evidence and create false evidence.  Defendants further intended to defraud the court and others into relying on the various forgeries—"Version 2," the Cover Letter, and the La Cienega PMA—to the detriment of Plaintiffs and to force Plaintiffs to capitulate to Defendants' fraudulent and extortionate scheme by erasing evidence disproving Defendants' perjurious stories.

**L.    AEW Files a Motion for Terminating Sanctions Based on the Extensive Evidence of the Forgery, Fabrication, Manipulation, Concealment, and Destruction of Evidence**

139.   Based upon the substantial and largely uncontroverted evidence of the forgery, fabrication, manipulation, concealment, and destruction of evidence uncovered by the forensic examination of Shekhter's and the other Lincoln Studios Plaintiffs' hard-copy documents and forensic devices, as described in Paragraphs 72-138, *supra*, AEW and the other Lincoln Studios Defendants filed a Motion for Terminating and Other Sanctions in the Lincoln Studios Litigation (the "Sanctions Motion") on September 21, 2015.  The Sanctions Motion presented in detail the

documentary evidence, factual evidence, and forensic evidence of wrongdoing and perjury by Shekhter, NMS Capital, and their affiliates, and the prejudice this caused. The Sanctions Motion sought dismissal of the TAC, judgment in AEW's favor against NMS Capital on the Cross-Complaint for declaratory and injunctive relief, and monetary sanctions.

140.   Not deterred by the extensive evidence uncovered by the court-ordered forensic examination, Shekhter, NMS Capital, and the other Lincoln Studios Plaintiffs continued relying on the forged "Version 2."  On February 23, 2016, in furtherance of the fraudulent and extortionate scheme, Neil Shekhter submitted yet another perjurious declaration in the Lincoln Studios Litigation in opposition to the Sanctions Motion, standing by his forgeries and lies.  Specifically, in Paragraph 26 of the declaration, Shekhter stated:  "Once I received the full version of the JVA, I saw that Section 11 granted a 'Buy/Sell' right five years after formation of the Joint Venture, as opposed to three years to which we agreed.  I spoke with Mr. Samek on or shortly before September 14, 2010 and brought the error to Mr. Samek's attention.  He acknowledged that the provision was inaccurate and said he would fix it by changing Section 11's Buy/Sell from a 5-year term to a 3-year term."  In Paragraph 28, Shekhter stated: "Mr. Samek fixed the mistake in 'Version 1' and sent me 'Version 2' of the JVA . . . ."  Shekhter attached the forged "Version 2" to his February 23, 2016 declaration.  These sworn statements were knowingly false and misleading.  On or about February 23, 2016, Miller and Zelig, acting on behalf of Shekhter, NMS Capital, and the other Lincoln Studios Plaintiffs, caused the perjurious declaration to be sent via overnight delivery to Gibson Dunn.

141.   The parties briefed the Sanctions Motion extensively and participated in an 8-day evidentiary hearing before the Los Angeles Superior Court.

**M.** **Shekhter Disseminates the Sham Complaint in the Lincoln Studios Litigation and Makes False and Misleading Representations to Third Parties in an Attempt to Further the Extortionate Scheme**

142.    The filing of sham complaints and declarations was only one part of Defendants' fraudulent and extortionate scheme.  Having filed the forged "Version 2" in the Lincoln Studios Litigation and having asserted sham claims based on it, Defendants sought to increase the economic pressure by disseminating the forgery and their sham complaints to third parties, under the guise of providing "notice" of a pending lawsuit.  As always, however, Defendants' real goal was to inflict maximum economic damage on Plaintiffs and induce the reasonable fear of further economic loss by disrupting virtually all of their existing and prospective economic relationships.

143.    On or about March 16, 2016, Miller, on behalf of Neil Shekhter, NMS Properties, and NMS Capital, sent a letter via email and certified mail through the U.S. Postal Service to representatives of AEW CM and AEW P6's auditor, Pricewaterhouse Coopers LLP ("PwC"), and the Joint Venture and Subsidiary Companies' tax preparer, Goodwin Partners LLP ("Goodwin"), both located in the State of Massachusetts, attaching a copy of the TAC in the sham Lincoln Studios Litigation.  In the letter, Miller represented to PwC and Goodwin that the knowingly false and misleading "information" in the TAC "is critical to your audit," and "should be reflected in PwC's audit and in Goodwin's financial and tax reporting."  Upon information and belief, Defendants directed Miller to send the letter and complaint to AEW CM's auditor and accountant, knowing they contained false and misleading statements, with the intent that PwC and Goodwin would rely on Defendants' false and misleading statements to the detriment of the Investor Member and other Plaintiffs, and with the intent to disrupt Plaintiffs' prospective relationships with these firms through these harassing emails. As a direct and proximate result of Miller's false and misleading letter, Plaintiffs suffered damages.

144.   On or about March 28, 2016, Miller, on behalf of Neil Shekhter, NMS Properties, and NMS Capital, sent a letter via email and certified mail through the U.S. Postal Service to representatives of various Joint Venture lenders—Comerica Bank, KeyBank, Berkadia Commercial Mortgage LLC (located in Virginia), PNC Bank, NA, and PNC Real Estate (collectively, the "Joint Venture Lenders").  In the letter, Miller falsely represented that Neil Shekhter "did not forge anything" and that "Samek . . . created [Version 2] and sent it to Mr. Shekhter"—statements that Defendants knew to be false.  Upon information and belief, Defendants directed Miller to send the letter to the Joint Venture Lenders, knowing it contained false and misleading statements, with the intent that the Joint Venture Lenders would rely on those false and misleading statements to the detriment of Plaintiffs, including disrupting Plaintiffs' prospective relationships with the Joint Venture Lenders to make it impossible to refinance the Joint Venture's debts unless Plaintiffs capitulated to Defendants' fraudulent and extortionate scheme.  As a direct and proximate result of Miller's false and misleading letter, Plaintiffs suffered damages.

## N.    The Court Sustains the AEW Defendants' Demurrers to Defendants' Sham Complaint in the Lincoln Studios Litigation

145.   As set forth above, on or about April 5, 2016, the court in the Lincoln Studios Litigation issued a ruling sustaining the demurrers of the Lincoln Studios Defendants to all causes of action in the TAC without leave to amend and ordering them to prepare and serve a proposed order (the "April 5 Ruling").  On or about June 8, 2016, the court issued an order adopting its April 5 Ruling (the "June 8 Order").

146.   In the April 5 Ruling, the court held that, on its face, Article 6 of the JVA pertained to "distributions" and "does *not* provide [NMS] with a right to monetize or take-out Investor Member's interest."  (Emphasis in original.)  The court continued, "Section 6.1(b)(vii) does not make any mention of a buy-out, take-out, or monetization of *Investor Member's* interest" and Plaintiffs' reading of Section 6 "is contradicted by the other terms of the [JVA]."  The court separately held that the TAC was a "sham

pleading," in which the Lincoln Studios Plaintiffs sought to avoid the problems in the SAC, including its reliance on the forged "Version 2," by "omitt[ing] certain facts" in the TAC and/or pleading facts that were inconsistent with prior allegations—in other words, pretending that the forged "Version 2" did not exist and was not the basis for the Lincoln Studios Plaintiffs' claims in the hope of avoiding the consequences of the forgery.

147.    As a result of the April 5 Ruling and June 8 Order, the only claims that remained in the Lincoln Studios Litigation were the Investor Member's Cross Claims.[7]

## O.    Notwithstanding the April 5 Ruling, Shekhter Continues Disseminating False and Misleading Statements to Third Parties to Perpetuate the Fraudulent and Extortionate Scheme

148.    The court's April 5 Ruling did not deter Defendants from continuing to disseminate their sham complaint to third parties under the guise of providing "notice"—even though the Lincoln Studios Plaintiffs no longer had any pending claims in the Lincoln Studios Litigation about which they could provide any legitimate notice.

149.    On or about June 2, 2016, Miller, on behalf of Neil Shekhter, NMS Properties, and NMS Capital, sent a letter via email and certified mail through the U.S. Postal Service to representatives of Eastdil Secured, LLC, the listing agent (the "Listing Agent") for the Joint Venture's portfolio of Properties, which Plaintiffs were trying to market for sale.  In the letter, Miller falsely represented that "AEW has no right, or authority, to engage you and your company to market this portfolio," and

---

[7] On November 6, 2015, the Investor Member filed a Cross Complaint against NMS Capital seeking injunctive relief and declaratory relief.  In particular, the Investor Member sought a judgment declaring that the as-amended Agreement is operative, that "Version 2" is a forgery, that NMS Capital breached the Agreement, and that the Investor Member was within its rights to both sell the Properties in its sole discretion and remove NMS Capital as the Operating Member.  The Cross Complaint also sought injunctive relief prohibiting NMS Capital from continuing to breach the Agreement and prohibiting NMS Properties from continuing to breach the PMAs.

Gibson, Dunn & Crutcher LLP

threatened to "hold [the Listing Agent and its representatives] responsible and liable for interference . . . , exposing you to in excess of $500 million in damages."  Miller also demanded that the Listing Agent "inform any prospective purchasers about," *inter alia*, the sham Lincoln Studios Litigation and "NMS' claims" therein—*even though the court's April 5 Ruling had sustained demurrers to all of the Lincoln Studios Plaintiffs' claims*.  Upon information and belief, Defendants directed Miller to send the letter to the Listing Agent, knowing it contained false and misleading statements, with the intent that the Listing Agent would rely upon them to the detriment of Plaintiffs and to make it impossible for Plaintiffs to sell the Joint Venture Properties unless they capitulated to Defendants' fraudulent and extortionate scheme by threatening the Listing Agent tasked with pursuing a valid sale.[8]  As a direct and proximate result of Miller's false and misleading letter, Plaintiffs suffered damages.

150.   On or about June 24, 2016, even as he continued to dispute the authenticity of the JVA and Plaintiffs' rights thereunder, Neil Shekhter sent the Investor Member, AEW CM, and DLA a purported "Buy/Sell Offer Notice Pursuant to Section 11 of the JVA, dated September 8, 2010" (the "Alleged Notice").  In the Alleged Notice, Shekhter, on behalf of NMS Capital, purported to "provide[] notice of [its] exercise of its Buy/Sell offer in the amount of US $500 million" "[p]ursuant to Section 11.1" of the JVA—an agreement the authenticity and validity of which Shekhter was then contesting in the sham Lincoln Studios Litigation.  This Alleged Notice was sent by email and certified mail through the U.S. Postal Service to the

---

[8]  On or about June 21, 2016, in furtherance of Defendants' tortious scheme, Adam Shekhter handed out copies of the false and misleading letter to representatives of the Listing Agent and Invesco Real Estate ("Invesco"), who were, at the time, touring the Properties as a potential buyer.  Upon information and belief, Neil Shekhter directed Adam Shekhter to give copies of the letter to the Listing Agent and Invesco with the intent to disrupt the sale of the Properties and thus further the extortionate scheme.  As a direct and proximate result of the distribution of Miller's false and misleading letter, Plaintiffs suffered damages.

Investor Member in Massachusetts, AEW CM, and the former attorneys for the Investor Member, also located in Massachusetts.

151.   Even leaving aside Shekhter's and NMS Capital's repudiation of the JVA and fabrication of a forgery, the Alleged Notice was ineffective.  First, the Alleged Notice was defective on its face.  Pursuant to Section 11.1(a)(ii), a valid Buy/Sell Offer Notice "shall include the Initiating Member's calculation of the Sale Price and Buy Price."  However, as another Los Angeles Superior Court later held when NMS Capital attempted to compel "specific performance" of its alleged Buy/Sell rights, the Alleged Notice "reveals no Sale or Buy Price calculation" and "does not conform to a mandatory term" of the JVA.  Second, NMS Capital had forfeited its Buy/Sell rights through its misconduct.  As the court found in the Lincoln Studios Litigation, NMS Capital had committed multiple "Removal Events" under the JVA, and Section 11.1(a)(i) prohibits the Operating Member from giving a Buy/Sell Offer Notice "at any time after the occurrence of a Removal Event."

152.   On or about June 29, 2016, Miller, on behalf of NMS Properties and NMS Capital, sent a letter via email and certified mail through the U.S. Postal Service to three representatives of Invesco, a potential buyer of the Joint Venture's portfolio of Properties ("Potential Buyer No. 1"), attaching a copy of Defendants' knowingly false and misleading complaint in the sham Lincoln Studios Litigation.  Two of these representatives are located in Georgia.  Miller also sent a copy to a representative of Gibson Dunn, a representative of AEW CM, and an attorney for the Listing Agent in New York.  In the letter, Miller falsely represented that "AEW has no right to sell, transfer, assign, hypothecate or otherwise encumber all or any part of the JV Properties," and that "AEW's interest in the Joint Venture [is] *zero*."  In addition, Miller misleadingly described the TAC as the "operative complaint," and purported to put Potential Buyer No. 1 on notice that his clients will hold it "responsible for interference and conspiracy, exposing your organization[] to over $500 million in damages," if it does not "immediately cease and desist from interfering with the

contractual rights of our clients by attempting to purchase the JV Portfolio." Upon information and belief, Defendants directed Miller to send the letter and sham complaint to Potential Buyer No. 1, knowing they contained false and misleading statements, with the intent that Potential Buyer No. 1 would rely on them to the detriment of Plaintiffs and to disrupt any potential sale to Potential Buyer No. 1.

153.   On or about June 29, 2016, Miller, on behalf of NMS Capital and NMS Properties, sent another letter via email and certified mail through the U.S. Postal Service to representatives of First American Title Insurance Company, Fidelity National Financial in Florida, Stewart Title Insurance Guaranty in Texas, Old Republic Insurance Company, North American Title Insurance Company, Chicago Title Insurance Company, Investors Title Company in Illinois, Land America Financial Group, Attorney's Title Insurance Funds, Inc. in North Carolina, Lawyer's Title Insurance Corporation in Nebraska, Westcor Land Title Company, Ticor Title, United General Title Insurance Company, and Commonwealth Land Title Insurance Company, which together constituted most if not all of the major title insurance companies in the United States (collectively, the "Prospective Title Insurers"), attaching a copy of Defendants' knowingly false and misleading complaint in the sham Lincoln Studios Litigation. Miller also sent a copy to an attorney for the Listing Agent located in New York. In the letter, Miller falsely represented that "AEW has no right to sell, transfer, assign, hypothecate or otherwise encumber all or any part of the JV Properties," and that "AEW's interest in the Joint Venture [is] *zero*." In addition, Miller misleadingly described the TAC as the "operative complaint," and purported to put the Prospective Title Insurers on notice that "NMS will hold [them and their representatives] responsible and liable for . . . potentially hundreds of millions in compensatory and punitive damages" if they "provide title insurance for, facilitate, or in any way participate in the sale of the JV Properties." Upon information and belief, Defendants directed Miller to send the letter and sham complaint to the Prospective Title Insurers, knowing they contained false and misleading statements, with the intent

that the Prospective Title Insurers would rely on them to the detriment of Plaintiffs and refuse to issue title insurance in connection with the sale or refinancing of any of the Joint Venture Properties.  At the time that Miller's June 29, 2016 letter was sent, Plaintiffs had already secured a commitment from one of the Prospective Title Insurers to issue title insurance in connection with the sale of the Joint Venture Properties. However, after receiving a copy of Miller's June 29, 2016 letter, that title insurance company informed Plaintiffs that it would no longer honor its commitment because of Miller's June 29, 2016 letter.  Plaintiffs were unable to obtain title insurance for any sale after that time, making the sale of the Properties much more difficult by making it impossible to obtain lender financing, and were injured as a direct result of the June 29, 2016 letter and Defendants' fraudulent and extortionate scheme to the tune of many millions of dollars.

154.   Also on or about June 30, 2016, Miller, on behalf of NMS Capital and NMS Properties, sent a letter via email and certified mail through the U.S. Postal Service to representatives of Douglas Emmett, another potential buyer of the Joint Venture's portfolio of Properties ("Potential Buyer No. 2"), attaching a copy of Defendants' knowingly false and misleading complaint in the sham Lincoln Studios Litigation.  Miller also sent a copy to an attorney for the Listing Agent located in New York.  In the letter, Miller falsely stated that "AEW has no right to sell, transfer, assign, hypothecate or otherwise encumber all or any part of the JV Properties."  In addition, Miller misleadingly described the TAC as the "operative complaint," and purported to put Potential Buyer No. 2 on notice that it "could face legal exposure and liability to our clients for hundreds of millions of dollars in compensatory and punitive damages for interfering with our clients' contractual rights and prospective economic benefit," if it "continues its efforts to purchase the JV Properties."  Upon information and belief, Defendants directed Miller to send the letter and sham complaint to Potential Buyer No. 2, knowing they contained false and misleading statements, with

the intent that Potential Buyer No. 2 would rely on them to the detriment of Plaintiffs, and to disrupt any potential sale to Potential Buyer No. 2.

155.   On or about June 30, 2016, Miller, on behalf of Neil Shekhter, NMS Properties, and NMS Capital, also sent a letter via email and certified mail through the U.S. Postal Service to three executives with Equity Residential ("Potential Buyer No. 3"), another potential buyer of the Joint Venture's portfolio of properties, attaching a copy of Defendants' knowingly false and misleading complaint in the sham Lincoln Studios Litigation.  Miller also sent a copy to an attorney for the Listing Agent located in New York.  In the letter, Miller falsely stated that "AEW has no right to sell, transfer, assign, hypothecate or otherwise encumber all or any part of the JV Properties," and purported to put Potential Buyer No. 3 and its executives on "notice that you and your company could face legal exposure and liability to our clients for hundreds of millions of dollars in compensatory and punitive damages for interfering with our clients' contractual rights and prospective economic benefit."  Miller further warned that "if Equity Residential continues its efforts to purchase the JV Properties, our clients will hold Equity Residential responsible for this interference, exposing you and your company to over $500 million in damages."  Upon information and belief, Defendants directed Miller to send the letter and sham complaint to Potential Buyer No. 3, knowing they contained false and misleading statements, with the intent that Potential Buyer No. 3 would rely on them to the detriment of Plaintiffs, and to disrupt any potential sale to Potential Buyer No. 3.

156.   On or about July 18, 2016, Samek of AEW sent a letter to KeyBank, asking that the bank extend the maturity dates of three loans relating to the Joint Venture's Properties at 1420 5th Street, 9901 Washington Boulevard, and 1430 5th Street, in order to facilitate the sale of those Properties.  Shortly thereafter, on or about July 26, 2016, Miller, on behalf of NMS Properties, NMS Capital, and Neil Shekhter, sent a letter via email and overnight mail through Federal Express to representatives of KeyBank in Colorado and Utah, attaching a copy of the knowingly false TAC in the

sham Lincoln Studios Litigation.  In the letter, Miller disputed that "the extensions of the Loans" were being done to facilitate the sale of the Properties, falsely stating that "AEW has no right to sell, transfer, assign, hypothecate or otherwise encumber all or any part of the JV Properties," and warning that NMS "will sue any prospective purchaser that interferes with NMS' rights to purchase the Properties."  Upon information and belief, Defendants directed Miller to send the letter and sham complaint to KeyBank, knowing they contained false and misleading statements, with the intent that KeyBank would rely on them to the detriment of the Investor Member.  As a direct and proximate result of Miller's false and misleading letter, KeyBank refused to extend the maturity date on the loans, causing the Joint Venture to go into default and incur more than $1 million in forbearance fees, default interest, and legal fees.

157.   On or about September 26, 2016, Shekhter sent a letter via certified mail through the U.S. Postal Service to thirty-seven entities that Shekhter believed invested in AEW P6, including representatives in the states of Mississippi, New York, Virginia, Massachusetts, Louisiana, Texas, Tennessee, Washington D.C., Ohio, Pennsylvania, Georgia, Indiana, and Michigan.  Shekhter, who, along with his Co-Conspirators, had caused several Joint Venture Property loans to go into default as a result of their fraudulent and extortionate scheme, confirmed in the letter that he was trying to use the defaults to instill fear that AEW would face potential financial ruin if it did not give in to the extortionate demand to sell the Properties to him.  Writing to investors of AEW as part of this scheme, Shekhter emphasized that the loans "are due," that they "are secured by the JV Properties," that one bank "won't extend the maturity date and has put the loans in default," and that defaults "create a substantial risk to your . . . investment."  Shekhter also made several false, fraudulent, and misleading statements in the letter, including the claim that he had the "right" to buy "the portfolio" (he did not) and that he offered to buy "the portfolio" for $500 million (he had not, nor could he).  Shekhter's "offer" had been to buy AEW's interest in the Joint Venture and to

pay AEW tens of millions of dollars less than it was entitled to while still suing AEW for all of that money back and more. Shekhter also attached to his letter a copy of the knowingly false TAC in the sham Lincoln Studios Litigation. Upon information and belief, Defendants approved Shekhter's letter, knowing it contained false and misleading statements, with the intent that these investors would rely on them to the detriment of Plaintiffs, and for the purpose of causing reasonable fear of economic loss of the part of Plaintiffs.

**P.    In Furtherance of Defendants' Scheme, NMS Properties Refuses to Cooperate with its Termination, Refuses to Vacate the Properties, and Misappropriates the Joint Venture's Funds and Property**

158.   NMS Properties was terminated as the property manager of the Joint Venture's Properties as of June 10, 2015. Among other things, NMS Properties was required upon termination to deliver (1) a "final accounting, reflecting the balance of income and expenses" of the Properties; (2) "[a]ny balance of monies of Owner or tenant security deposits, or both, held by Manager with respect to the Property"; and (3) all "records, contracts, leases, tenant correspondence, files," and all other "information which pertain in any way to the Property." It did none of these things.

159.   Since its termination, NMS Properties, under the direction and control of its CEO Shekhter and President Margot Shekhter, has continued to collect rents for all Properties except 9901 Washington, has continued to hold itself out as the property manager at all Properties except 9901 Washington, has refused access to the books, records, and accounts of the Joint Venture Properties, has refused to vacate the Joint Venture Properties and has refused to surrender the rents it collected after being terminated as property manager despite being instructed to do so by the Joint Venture and Subsidiary Companies. Pursuant to the termination of the PMAs, all rents and monies collected by NMS Properties following the effective date of its termination belong to the Joint Venture and Subsidiary Companies. As such, NMS Properties has no right to retain, withhold, spend, or otherwise control money it wrongfully collected

while holding itself out as property manager without the authorization or consent of the Subsidiary Companies or Joint Venture.

160.    Upon information and belief, NMS Properties, under the control and direction of Shekhter and Margot Shekhter, wrongfully occupied the Properties, misappropriated Joint Venture money, and refused to transition to a new property manager for the purpose of harming AEW and inducing the reasonable fear of further economic harm if AEW does not accede to Defendants' fraudulent and extortionate demands.  Physically occupying the Properties, refusing to vacate the Properties, refusing to transfer or grant access to the Joint Venture's funds and bank accounts, and refusing to hand over or grant access to the Joint Venture's books and records for the Properties were yet other elements of the extortionate scheme to prevent Plaintiffs from marketing or selling the Properties by making it impossible for Plaintiffs or any potential buyers to conduct crucial due diligence, such as inspection of books and records or the Properties themselves.  By denying Plaintiffs this access, Defendants attempted to ensure that no one except Defendants would be comfortable buying the Properties.  These tactics went hand in hand with Defendants' successful threats to Prospective Title Insurers, which made it even more difficult to find a third-party buyer for the Properties because it was impossible for the Joint Venture to obtain title insurance, making it impossible to finance a sale transaction with a bank loan. Defendants' goal was to foreclose all sale options except the forced sale to NMS by denying access for due diligence and closing off the most obvious source of financing. In the end, the Joint Venture was able to find a qualified and willing buyer, but as a result of these extortionate acts, the Joint Venture was forced to use seller financing and absorb the resulting loss on the value of the sale which, by current estimates, caused millions of dollars in damages.

**Q.    As a Direct Result of Defendants' Tortious and Criminal Conduct, the Joint Venture is Forced to Sell the Properties on Materially Worse Terms and at a Substantially Reduced Price**

161.    On or about October 31, 2016, notwithstanding Defendants' criminal and tortious conduct, the Subsidiary Companies entered into a Purchase and Sale Agreement for sale of the Joint Venture's portfolio of Properties.  The Joint Venture Properties were sold to third parties (the "Buyers") following an extensive marketing process conducted by the Listing Agent, a highly qualified real estate brokerage firm retained by the Joint Venture to market and sell the Joint Venture Properties to the most qualified buyer in the marketplace.  However, as a result of Defendants' criminal and tortious conduct, fewer prospective buyers were willing to make offers, adversely impacting the true market value of the Properties.

162.    In or around June 2016, shortly after the Listing Agent began undertaking efforts to market and sell the Properties, Defendants launched a full-scale campaign of harassment and intimidation designed to interfere with the marketing and sale of the Properties.  As set forth above, Defendants, through their counsel, disseminated copies of the forged "Version 2" and the sham complaint in the Lincoln Studios Litigation to prospective lenders, Prospective Title Insurers, and Potential Buyers, made knowingly false and defamatory statements regarding Plaintiffs' right to market and sell the Properties to the prospective lenders, Prospective Title Insurers, and Potential Buyers, and baselessly threatened the prospective lenders, Prospective Title Insurers, and Potential Buyers with hundreds of millions of dollars in potential liability if they participated in the sale and marketing of the Properties.  As a direct and proximate result of Defendants' false and misleading statements, none of the Prospective Title Insurers were willing to provide title insurance, including at least one of the Prospective Title Insurers that had previously agreed to provide title insurance. Defendants embarked on these acts with the intent that these third parties would rely on Defendants' false and misleading statements to the detriment of Plaintiffs, in an

attempt to prevent a sale of the Joint Properties and imminent default on Joint Venture loans unless Plaintiffs capitulated to Defendants' fraudulent and extortionate scheme.

163.    As a direct result of Defendants' conduct, Plaintiffs suffered serious damages.

**R.    The Court in the Lincoln Studios Litigation Issues Terminating and Monetary Sanctions Against Defendants**

164.    On July 29, 2016, after extensive briefing by the parties, the court preliminarily granted AEW's Spoliation Motion, finding that NMS, Shekhter, and their affiliates engaged in "purposeful, bold, breathtaking violations of this Court's Orders that [were] UNDISPUTED and ADMITTED," but subject to a later evidentiary hearing.  The court found that "Plaintiffs' own evidence and/or undisputed facts establish violations of the court's [Freeze] and [Forensic Examination] orders."  The court further found that Shekhter manipulated and replaced his computer hard drive "before the scheduled forensic examination" and "[b]y his own admission" destroyed this and other evidence "with the admitted intention of preventing the forensic expert(s) from discovering deleted files."  In addition, the court found that Shekhter failed to produce external devices such as the USB drive, that Shekhter admitted to intentionally deleting a zip drive containing relevant documents before the forensic examination, and that the IT Administrator for NMS Properties admitted to removing Adobe Acrobat from Adam Shekhter's computer and using Eraser Portable on an NMS computer.

165.    The court ordered an evidentiary hearing to determine the full extent of misconduct and the specific sanctions to be imposed.  That evidentiary hearing began on October 14, 2016 and continued for eight days over the following three weeks. AEW presented extensive testimony about the forgery, fabrication, and destruction of evidence by Shekhter and the other Lincoln Studios Plaintiffs.  Gerald LaPorte, a document forensic expert trained by the U.S. Secret Service who now works in the Department of Justice testified that "Version 2," the Cover Letter, and the La Cienega

PMA were not authentic, and that the forgeries by Shekhter and NMS were "so blatant
. . . that you would do a presentation on [it] or write [about it] in a text book." Samuel
Rubin, an expert in electronic forensics who has performed thousands of forensic
investigations, characterized the forgery, fabrication, and destruction of evidence by
Shekhter and NMS as "almost like a case study in antiforensic measures." After the
conclusion of the evidentiary hearing, on November 22, 2016, the court issued a 94-
page Order detailing the overwhelming evidence of misconduct (the "Sanctions
Order") and finding the following:

> 'Version 2' was created by Neil Shekhter and his son Adam Shekhter in
> July 2013 . . . . [and] 'Version 2' is not an authentic document. It is a
> forgery. . . . Two versions of the 'La Cienega PMA' were created on June
> 24, 2015, and both were fabrications. . . . The 'Cover Letter' was created
> by Plaintiffs in 2015, not sent by Mr. Samek to NMS in September 2010
> . . . . [and] Neil Shekhter's refusal to testify at the Evidentiary hearing
> regarding these matters confirms there is no credible explanation other
> than forgery.

166.   A copy of the Sanctions Order is attached hereto as **Exhibit 4**. The court
found unequivocally that "Version 2" and the 3-year Buy/Sell term contained therein is
a forgery. As the court noted, AEW provided "ample testimony" and "extensive
contemporaneous documentary evidence" that the 5-year Buy/Sell—not the 3-year
Buy/Sell—was agreed to by the parties, and NMS' own witnesses confirmed that it
was NMS' own request for a 5-year Buy/Sell, which was accepted by the parties and
executed. "[M]ultiple witnesses" also confirmed the validity of the Specified
Properties Amendments, which were consistently relied upon by the parties. NMS'
only testimony to the contrary was Shekhter's "self-serving declaration," which "the
Court finds not to be credible." The court's findings were extensive:

- "Version 2" was forged in July 2013 by Shekhter and his son Adam Shekhter;
- NMS' "arguments to the contrary are not convincing or credible;"
- The fact that neither Shekhter nor Adam testified at the hearing "only confirms that there is no viable alternative explanation;" and
- NMS' own expert witnesses did not confirm the authenticity of "Version 2."

167.   The court also determined that the La Cienega PMA is a forgery, that Shekhter and NMS provided no credible explanation for the document's sudden appearance, for the initial botched forgery, or for any of the other hallmarks of forgery surrounding its origins.  There was also "extensive other evidence that the parties did not agree to the" forgery, including the requirements of the JVA, the Form PMA, and the approved draft La Cienega PMA, all of which contained the 30-day notice provision.  None of Plaintiffs' experts opined that the La Cienega PMA was authentic, and NMS' own former Vice President of Finance confirmed the parties used a "form" PMA with the 30-day notice provision.

168.   The court also found that the Cover Letter that Shekhter claimed accompanied "Version 2" in 2010 was a forgery, that Shekhter attempted repeatedly to backdate it, and that NMS provided no explanation as to how this "fatal" letter was never produced or even alluded to until over five years after Shekhter alleged he received it.  As the court noted, "Neil Shekhter's refusal to testify at the Evidentiary Hearing regarding these matters confirms there is no credible explanation other than forgery."

169.   The Court's findings regarding the spoliation, forgery, and fabrication of evidence by Defendants was far-reaching:  Defendants manipulated Shekhter's computer, which was "indisputably a critical piece of evidence;" they misled the court about their preservation of evidence; they willfully and repeatedly violated court Orders; they acted intentionally to conceal and destroy relevant evidence; they concealed the computer used to create "Version 2," which was "another critical piece of evidence;" and they "engaged in an extensive plan to alter, conceal, destroy, or manipulate evidence in violation of the Court's [orders]."  As the court put it, "[t]he fact that Neil and Alan Shekhter, NMS' IT Administrator, Enrique Sanchez, and NMS' own forensic expert, Scott Cooper, were all present at NMS' offices" when Shekhter's computer was backdated and flooded with over 60,000 files minutes before the Court-ordered forensic examination began "is, quite frankly, shocking."  In fact, Cooper

agreed with this sentiment, testifying on the stand that, as a forensics expert, he "would not advise somebody" to do what Shekhter did, and that the actions taken by Shekhter were a "dumb . . . [b]ad idea."

170.    In addition to forgery and the destruction of evidence, the court also detailed how Shekhter and Defendants repeatedly "provided false testimony under oath in order to mislead the Court and cover up their own misconduct," found that each of Defendants' expert witnesses lacked credibility or were unconvincing, found that the credibility of NMS' potential witnesses were all "undermined by their failure to appear and testify," and found that AEW "easily" showed the prejudice they suffered as a result of NMS' massive misconduct, which "constitutes prejudice of the highest magnitude."

171.    On December 1, 2016, the court issued the Final Judgment dismissing the Lincoln Studios Plaintiffs' Third Amended Complaint on two grounds:  first, by granting the demurrer to the TAC, as discussed above, in part because the TAC was a sham pleading and because the JVA had no "buy out" right; and second, as a terminating sanction for the forgery, fabrication, and spoliation of evidence, as detailed in the Sanctions Order.  All of NMS' affirmative claims in the Lincoln Studios Litigation were squarely rejected:  there was no "buy out" right in the JVA, "Version 2" is a forgery, the JVA as amended reflects the Specified Properties Amendments, and NMS has lost its Buy/Sell rights.

172.    On December 2, 2016, after conducting a prove-up hearing, the Court issued the Amended Default Judgment ("Default Judgment"), striking NMS' Answer to AEW's Cross-Complaint, entering judgment in AEW's favor, and granting over $6 million in attorneys' fees and costs to AEW.  A true and correct copy of the Default Judgment is attached hereto as **Exhibit 5**.

173.    In the Default Judgment, the court found that the operative JVA is the as-amended JVA containing a 5-year Buy/Sell Provision and the Specified Properties Amendments (attached hereto as Exhibit 2); that the so-called "Version 2" "is a

fabrication and forgery"; that the Investor Member has the authority to sell the Joint Venture Properties "in its sole and absolute discretion"; that NMS Capital repeatedly breached the JVA, including through a "broad variety of fraudulent conduct, misrepresentations, and forgeries"; that NMS committed multiple Removal Events and Events of Default; that NMS Capital was properly removed as the Operating Member of the Joint Venture; that NMS had lost its right to invoke the Buy/Sell rights in Section 11.1; that the PMAs were rightfully terminated; and that NMS Capital had lost its right to collect certain distributions under the JVA.  The court also granted the Cross-Complaint's request for injunctive relief, and "enjoined [NMS] from continuing to breach the JVA."  These findings also made clear that NMS' affirmative claims were completely without merit—in addition to the Demurrer Order's finding that there is no "buy out" right in the JVA, NMS also has no authority to interfere with the sale of the Properties, is no longer the Operating Member, and cannot wrongfully exclude AEW from the Properties.

## S.    Defendants Continue Their Fraudulent and Extortionate Scheme

174.    While the Lincoln Studios and Property Management Litigations were still ongoing, and in order to inflict maximum pressure on Plaintiffs, Defendants also initiated a series of copycat lawsuits involving the same false and misleading allegations regarding the authenticity and validity of the JVA and Plaintiffs' rights thereunder.  Defendants have filed the copycat lawsuits without regard to the merits of their claims and for the purpose of perpetuating the fraudulent and extortionate scheme and ensuring that it continues indefinitely into the future.  This tactic is exactly the approach Defendants' counsel threatened to take if Plaintiffs did not give in to Defendants' extortionate demands—to sue AEW until it breaks.

175.    Defendants themselves reiterated this threat in an August 8, 2016 letter from Shekhter to representatives of AEW CM in Massachusetts as well as an attorney for the Listing Agent in New York via both email and U.S. Mail.  In the letter, Shekhter expressly warns that "***[o]ne way or another***, I intend to pay-back and/or buy-

out AEW and get AEW and its AEW Fund VI investors out of this portfolio," and that *"[y]our [AEW's] best case scenario is years of litigation* before there is any finality or resolution." (Emphases added.)

176.   True to their word, in lawsuit after lawsuit, Defendants have advanced objectively baseless, frivolous, and already rejected arguments regarding NMS' non-existent "buy out rights," relying on the forged "Version 2," and denying its own well-established misconduct—all for the purpose of injuring Plaintiffs and instilling the fear of economic loss on the part of Plaintiffs.  Indeed, Defendants have continued to file sham lawsuits and sham amendments in their existing lawsuits even after the judgments in the Lincoln Studios Litigation confirmed that "Version 2" was a forgery, that NMS did not have a "buy out right," and that NMS, rather than AEW, had committed numerous Events of Default under the JVA.  Upon information and belief, Defendants authorized and directed the filing of the sham copycat lawsuits without regard to their merits and for the purpose of causing a reasonable fear of economic loss on the part of Plaintiffs, and with the intent that the courts in those cases would rely on the false and misleading allegations to the detriment of Plaintiffs.  As of the filing of this Complaint, Defendants continue to prosecute these sham lawsuits, continue to rely on and submit the proven forgeries to courts, and have authorized and directed the filing and pursuit of the frivolous appeal of the sham Lincoln Studios Litigation.

**T.     Defendants Wrongfully Sue the Buyers of the Joint Venture Properties and Falsely Instruct Tenants to Pay Defendants the Rent Owed to the Buyers**

177.   In furtherance of their fraudulent and extortionate scheme, on December 1, 2016, Defendants sued the Buyers of the Joint Venture Properties, wrongfully claiming to be the rightful owners of the Joint Venture Properties.  *Shekhter, et al. v. Wong, et al.*, Case No. SC126760 (L.A.S.C., filed December 1, 2016) ("Buyer Litigation").  Plaintiffs never had the right to buy the Properties from the Joint Venture, have never been the rightful owners of the Joint Venture Properties, and

certainly were not the owners after Plaintiffs sold the Properties to the Buyers in November 2016.  Defendants' filing of yet another frivolous complaint was an attempt to thwart the rightful sale and to further injure Plaintiffs, whose indemnity obligations under the Purchase and Sale Agreement were triggered by Defendants' sham lawsuit.

178.   Upon the sale of the Joint Venture Properties, Defendants were informed of the sale and NMS Properties was once again told it was terminated.  That termination was provided for immediately upon sale, and AEW had the sole discretion to cause that sale to take place.  NMS Properties and the other Defendants, however, refused to vacate the Joint Venture Properties and wrote to the tenants of the Joint Venture Properties on or around November 23, 2016 by First Class mail through the U.S. Postal Service and, upon information and belief, email, telling the tenants that the Joint Venture Properties were not sold and that all rent should continue to be paid to NMS Properties.  Specifically, the letter misrepresented that:

> We are writing to confirm that there has been no change in Landlord or obligations to Landlord as per your current lease agreement. Additionally, NMS Properties, Inc. remains the property manager servicing your property.

Defendants intended for the tenants to rely upon those false representations in order to induce the tenants to pay their rent to Defendants rather than to the Buyers.

179.   The tenants relied on those false representations and paid their rent in December 2016 and January 2017 to Defendants rather than to the Buyers, thereby stealing millions of dollars' worth of rent from the Buyers, for which certain Plaintiffs must now indemnify the Buyers.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### (Violations of RICO, 18 U.S.C. § 1962(c))

### (All Plaintiffs As Against Defendant Neil Shekhter)

180.   Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

181.   At all relevant times, Plaintiffs were "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

182.   At all relevant times, Defendant Neil Shekhter was a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

## A.   The RICO Enterprise

183.   Defendants Neil Shekhter, Margot Shekhter, NMS Properties, NMS Capital, and the Non-Party Co-Conspirators are a group of persons associated together for the common purpose of carrying out an ongoing criminal enterprise through a multi-faceted campaign of forgeries, lies, threats, and sham lawsuits for the purpose of coercing Plaintiffs into paying millions of dollars to Defendants or, alternatively, destroying Plaintiffs' business by interfering with their contracts and economic relationships.

184.   Defendants and their Co-Conspirators have organized their operation into a cohesive group with specific and assigned responsibilities and a clear command structure.  While the organization of the criminal enterprise has changed over time, and its members may have held different roles at different times, the criminal enterprise has generally been structured to operate as a continuing unit in order to accomplish the goals of their criminal enterprise:

  a. Neil Shekhter has orchestrated and overseen the scheme to defraud and extort Plaintiffs, and has directed Defendants and the Non-Party Co-Conspirators to accomplish the overall aims of the criminal enterprise—namely, forging documents, disseminating the forged documents, filing sham lawsuits, destroying evidence, spreading false and misleading information to third parties, and systematically obstructing Plaintiffs' business and efforts to uncover Defendants' wrongdoing.

  b. Defendant Margot Shekhter authorized and participated in the filing and continued prosecution of the sham Lincoln Studios Litigation notwithstanding having repeatedly been put on notice that "Version 2" of

the JVA was a forgery and fabrication.  In fact, Defendant Margot Shekhter verified discovery responses in the Lincoln Studios Litigation where she claimed that the forged "Version 2" was enforceable, after having repeatedly been put on notice of its fabrication.

c.  Defendants NMS Properties and NMS Capital have authorized and participated in filing and prosecuting the sham lawsuits, forging of documents, disseminating the forged documents, destroying evidence, spreading false and misleading information to third parties, and systematically obstructing Plaintiffs' business and efforts to uncover Defendants' wrongdoing.

d.  Non-Party Co-Conspirators Adam Shekhter, Alan Shekhter, Enrique Sanchez, Brian Bowis, and Eddie Valentin have been responsible for creating the forgeries and/or destroying evidence of their creation.

e.  Non-Party Co-Conspirators Miller and Zelig have been responsible for prosecuting the sham lawsuits in California state court, disseminating copies of the forged documents to courts and other third parties, and spreading false and misleading information to third parties in an attempt to cripple Plaintiffs financially.

185.    Defendants and the Non-Party Co-Conspirators constitute an associated-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), referred to hereinafter as the "Enterprise."

186.    At all relevant times, Neil Shekhter participated in the operation and management of the Enterprise.

187.    At all relevant times, the Enterprise was engaged in, and its activities affected, interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c).

**B.    The Pattern of Racketeering Activity**

188.    Neil Shekhter conducted or participated in, directly or indirectly, the conduct, management, and operation of the Enterprise's affairs through a "pattern of

racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c), to wit, he has continuously and regularly committed multiple and related acts of racketeering activity since at least 2013 and continuing to the present. Defendants Margot Shekhter, NMS Properties, NMS Capital, and Non-Party Co-Conspirators agreed to commit multiple acts. Those multiple acts shared a common or related purpose, goal, result, participant, victim, and method of commission and extended over a substantial period of time, which are described below:

**1.     Attempted Extortion in Violation of the Hobbs Act, 18 U.S.C. § 1951**

189.   At all relevant times, Plaintiffs were engaged in interstate and foreign commerce and in an industry that affects interstate and foreign commerce.

190.   As described herein, Neil Shekhter has engineered a massive campaign of lies, forgeries, threats, and sham lawsuits, and demanded the sale of AEW's interest in the Joint Venture at a substantial discount, and demanded payment of millions of dollars, to bring about the cessation of these activities, all with the intent and effect of causing and instilling a reasonable fear of economic loss on the part of Plaintiffs.

191.   As described herein, Neil Shekhter has forged and fabricated documents and/or directed others to forge and fabricate documents, destroyed evidence and/or directed others to destroy evidence, and committed perjury and/or directed others to commit perjury, and relied on the forged documents, spoliated evidence, and perjurious testimony in the sham Lincoln Studios Litigation with the intent and effect of causing a reasonable fear of economic loss on the part of Plaintiffs.

192.   As described herein, Neil Shekhter has conspired with Margot Shekhter, NMS Properties, and NMS Capital to advance objectively baseless claims against Plaintiffs in the sham Lincoln Studios Litigation for the improper purpose of extorting the sought-after Joint Venture membership interest and payments from Plaintiffs.

193.   As described herein, Neil Shekhter has forged and fabricated documents and/or directed others to forge and fabricate documents, destroyed evidence and/or

directed others to destroy evidence, and committed perjury and/or directed others to commit perjury, and relied on the forged documents, spoliated evidence, and perjurious testimony in the Property Management Litigation with the intent and effect of causing a reasonable fear of economic loss on the part of Plaintiffs.  Through his wrongful conduct, Shekhter has deprived the Property Management Litigation of its legitimacy.

194.   As described herein, Neil Shekhter has conspired with Margot Shekhter, NMS Properties, and NMS Capital to advance objectively baseless claims against Plaintiffs in the sham copycat lawsuits pursuant to a policy of starting legal proceedings without regard to their merits and for the improper purpose of extorting the sought-after Joint Venture membership interest and payments from Plaintiffs.

195.   Neil Shekhter's wrongful conduct intended to induce, and did induce, a reasonable fear in Plaintiffs that Defendants will, among other things:  (1) continue to spread false and misleading information to third parties, including by, among other things, disseminating the forged documents and baselessly disputing Plaintiffs' contractual rights, unless and until Plaintiffs "settle" the sham lawsuits or otherwise give in to Neil Shekhter's baseless demands; (2) continue to litigate the sham Lincoln Studios Litigation; and (3) continue to file and pursue sham lawsuits against Plaintiffs based on the forged documents.  As described herein, these actions have created a reasonable fear on the part of Plaintiffs, including fear of economic loss.

196.   Accordingly, Neil Shekhter has unlawfully obstructed, delayed, and affected—and attempted to obstruct, delay, and affect—commerce as that term is defined in 18 U.S.C. § 1951, by extortion, as that term is defined in § 1951, in that Neil Shekhter attempted to induce Plaintiffs to consent to the relinquishment of AEW's interest in the Joint Ventures and/or the Properties through the wrongful use of actual or threatened force, violence, and fear—including fear of economic harm.

**2.     Mail and Wire Fraud in Violation of 18 U.S.C. §§ 1341, 1343**

197.   As described herein, Neil Shekhter has engaged, and continues to engage, in a wide-ranging scheme or artifice to defraud Plaintiffs, various courts of law, and

multiple third parties, including banks, title insurance companies, and potential buyers of the Properties, regarding the authenticity of the forgeries, and the genuineness of the operative JVA and the validity of Plaintiffs' rights thereunder.  The ultimate objective of the scheme or artifice to defraud was and is to coerce Plaintiffs into making a multi-million-dollar payment that would directly benefit Neil Shekhter and his co-defendants and co-conspirators.

198.   In furtherance of the scheme, and as described herein, Shekhter repeatedly used the mails and wires in furtherance of a fraudulent scheme with the object of obtaining money or property, in violation of 18 U.S.C. § 1341 (mail fraud) and § 18 U.S.C. § 1343 (wire fraud).  Neil Shekhter and his co-defendants and co-conspirators used the mails or wires to transmit the forgeries and false and misleading representations regarding the forgeries and the operative JVA and Plaintiffs' rights thereunder.  Specifically:

a. On or about July 12, 2013, Shekhter forwarded his son Adam Shekhter an email attaching PDFs of the original, executed JVA and the JVA as amended by the Specified Properties Amendments.  On information and belief, Shekhter used one of these PDFs as the basis for the forged "Version 2."

b. On or about July 15, 2013, Adam Shekhter emailed the forged "Version 2," which was printed and then scanned at the NMS offices to eliminate compromising metadata, to Neil Shekhter.

c. On or about July 18, 2013, Shekhter emailed the forged "Version 2" to Andrew Lucca, located in Arizona, and James Prouty, representatives of KeyBank, the federally insured lender for one of the Joint Venture's Properties.  In the email, Shekhter falsely represented that the forgery "is the version that I have executed in September 2010."  Shekhter knew "Version 2" was not the version he executed in September 2010 because he and his son had fabricated it days earlier.

d.  On or about July 19, 2013, Williford emailed Gibson Dunn the forged "Version 2," which he described as the "last version of the LLC Agreement that was approved by Neil [Shekhter], which was sent hard copy to our offices in September 2010 – with the buy-sell permitted after 3 years, which is consistent with the executed term sheet and the conversations of NMS and AEW over the last three years." This statement was false and misleading, as Shekhter—who ghost wrote the email—knew because he and his son Adam Shekhter fabricated the forged "Version 2" only days earlier.

e.  On or around November 18, 2013, in an email to Samek copying Williford, Margot Shekhter, and other NMS executives, Shekhter claimed that the January 2011 slipsheet pages containing the Specified Properties Amendments were not valid.  In this email, Shekhter claimed "I recently discovered that there are multiple copies of the LLC Agreement . . . that contain different terms" and "[a]pparently, the prior law firm for AEW 'slipped' pages into an iteration without my authorization."  Shekhter knew these statements were false and misleading because he and his son Adam Shekhter fabricated the only version of the JVA containing a 3-year Buy/Sell Provision.

f.  On or around April 21, 2015, the Lincoln Studios Plaintiffs filed the FAC in the Lincoln Studios Litigation alleging that the forged "Version 2" was the operative JVA.  On or around April 30, 2015, Zelig emailed the FAC to Gibson Dunn, and, on information and belief, around this time period, Defendants and their Co-Conspirators forwarded it to various lenders and third parties with the intention that the third parties would rely upon the false allegations and forged "Version 2" to the detriment of Plaintiffs.  On information and belief, the FAC was also sent to counsel for certain of the other defendants in the Lincoln Studios Litigation through email and the

U.S. Postal Service on or about April 21, 2015.  Defendants knew the forged "Version 2" was not the operative JVA because they forged it and because NMS's own counsel informed them it was not the operative JVA.

g.  On or around June 19, 2015, Shekhter submitted a perjurious declaration in the Property Management Litigation which attached and purported to authenticate the forged "Version 2" JVA.  On or about June 22, 2015, Miller and Zelig, counsel for NMS, acting on behalf of NMS Properties, caused the perjurious declaration to be sent through the U.S. Postal Service and facsimile to AEW's counsel at Gibson Dunn.  Shekhter knew the forged "Version 2" was not authentic because he and his son Adam Shekhter fabricated it in July 2013.

h.  At or around 9:00 a.m. on June 24, 2015, Shekhter emailed the initial botched forgery of the La Cienega PMA to his counsel with the intent that the forgery be relied upon in the *ex parte* notice and application being prepared by his counsel in the Property Management Litigation.  At or around 10:00 a.m. that same morning, Shekhter's counsel gave *ex parte* notice via email to Gibson Dunn of their intention to appear *ex parte* the next morning, in reliance on the botched forgery of the La Cienega PMA, with the intention to seek relief from the court based on the forgery. Shekhter knew the botched forgery was a botched forgery because he fabricated it that very morning.

i.  On or around 11:22 p.m. on June 24, 2015, after realizing his mistake in creating the botched La Cienega PMA, Shekhter emailed himself the corrected forged La Cienega PMA, intending that it be relied upon in the Property Management Litigation.  It was this version of the forged La Cienega PMA that was filed the following day.  Shekhter knew the forged La Cienega PMA was a forgery because he forged it.

j. On or around July 9, 2015, Shekhter submitted a supplemental declaration in the Property Management Litigation reaffirming the forgery and elaborating his perjurious story behind the forgery, falsely declaring "I did have discussions with the Investor Member about having a no-less-than 60-day termination provision for La Cienega" and "the Investor Member agreed to a termination period to [sic] 60 days." On or around July 9, 2015, Shekhter's counsel emailed Shekhter's July 9, 2015 declaration to Gibson Dunn. Shekhter knew these statements were false and misleading because he forged the La Cienega PMA for the very purpose of altering the 30-day termination period in the existing PMAs.

k. On or about September 10, 2015, Shekhter, NMS Capital, and the other Lincoln Studios Plaintiffs filed a Second Amended Complaint ("SAC") in the Lincoln Studios Litigation, emailed a copy to Gibson Dunn and counsel for other defendants in the Lincoln Studios Litigation, and mailed a copy through the U.S. Postal Service to the same. In the SAC, Defendants continued to advance and rely upon "Version 2," knowing it was a forgery.

l. On or about September 28, 2015, Shekhter submitted a perjurious declaration in the Lincoln Studios Litigation. Specifically, in Paragraph 13, Shekhter stated that "'Version 1' [the original executed JVA] appeared not to allow for a buy-sell until after year five, instead of after 3 years," that Shekhter "brought this to Mr. Samek's attention," and that Samek "acknowledged that the provision was inaccurate and he would correct same." Shekhter stated that "Version 2 arrived at my office accompanied by a letter (on 'AEW' letterhead, signed by Mr. Samek) dated September 14, 2010." In Paragraph 14, Shekhter stated that he "carefully maintained the original hard copies of Version 2 and Mr. Samek's September 14, 2010 cover letter for it." The sworn statements

were knowingly false and misleading.  Shekhter knew "Version 2" was not hand delivered to him in September 2010 because he and his son fabricated it in July 2013.  On or about September 28, 2015, Miller and Zelig, acting on behalf of Shekhter, NMS Capital, and the other Lincoln Studios Plaintiffs, caused the perjurious declaration to be mailed through the U.S. Postal Service to Gibson Dunn and counsel for other defendants in the Lincoln Studios Litigation.

m. On or about January 13, 2016, Shekhter, NMS Capital, and the other Lincoln Studios Plaintiffs filed a Third Amended Complaint ("TAC"), continuing to advance and rely upon "Version 2."  These allegations were knowingly false and misleading.  On or about January 13, 2016, Miller and Zelig, acting on behalf of Shekhter, NMS Capital, and the other Lincoln Studios Plaintiffs, caused the TAC to be emailed and mailed through the U.S. Postal Service to Gibson Dunn and, on information and belief, to counsel for other defendants in the Lincoln Studios litigation.

n. On or about January 19, 2016, Shekhter submitted another perjurious declaration in the Lincoln Studios Litigation, again relying on the forged "Version 2."  Specifically, in Paragraphs 11 and 12 of the declaration, Shekhter stated:  "Once I received the full version of the JVA, I saw that Section 11 granted a 'Buy/Sell' right five years after formation of the Joint Venture, as opposed to three years to which we agreed.  I brought the error to Mr. Samek's attention, and Mr. Samek said that he would fix it.  Mr. Samek fixed the mistake and sent me "Version 2" of the JVA . . . ."  These sworn statements were knowingly false and misleading.  Shekhter knew that Samek did not send "Version 2" in 2010 because he and his son Adam Shekhter fabricated it in July 2013.  On or about January 19, 2016, Miller, acting on behalf of Shekhter, NMS Capital, and the other Lincoln Studios Plaintiffs, caused the perjurious declaration to

be sent via overnight delivery to Gibson Dunn and, on information and belief, to counsel for other Lincoln Studios Defendants.

o. On or about January 27, 2016, Shekhter submitted another perjurious declaration in the Lincoln Studios Litigation, again relying on the forged "Version 2." Specifically, in Paragraphs 7 and 8 of the declaration, Shekhter stated: "Once I received the full version of the JVA, I saw that Section 11 granted a 'Buy/Sell' right five years after formation of the Joint Venture, as opposed to three years to which we agreed. I brought the error to Mr. Samek's attention, and Mr. Samek said that he would fix it. Mr. Samek fixed the mistake and sent me Version 2 of the JVA . . . ." These sworn statements were knowingly false and misleading for the same reasons set forth above. On or about January 27, 2016, Miller, acting on behalf of Shekhter, NMS Capital, and the other Lincoln Studios Plaintiffs, caused the perjurious declaration to be emailed and mailed through the U.S. Postal Service to Gibson Dunn.

p. On or about June 21, 2015, Shekhter emailed himself one version of the forged Cover Letter. Shekhter knew the forged Cover Letter was a forgery because he fabricated it. Forensic evidence established that while the metadata associated with the PDF of the forged Cover Letter Shekhter sent himself indicated the PDF was created on "September 21, 2010," the software used to create that PDF did not exist until December 2014, four years later.

q. At or about 12:17 a.m. on September 9, 2015, Shekhter sent the forged Cover Letter to Terra Andersen, an NMS Properties employee, asking if she "can tell when the original was taken or scanned." Shekhter sent the forged Cover Letter knowing full well it was a forgery—and not an original—because he fabricated it.

r.  At or about 8:34 a.m. on September 18, 2015, Shekhter sent an email to Enrique Sanchez, IT Administrator of NMS, asking him to "[p]lease take a look at metadata" and attaching three PDF versions of the forged Cover Letter.  Shekhter sent the forged Cover Letter knowing full well it was forgery—and not an original—because he fabricated it.

s.  On or about September 28, 2015, Shekhter submitted a declaration attaching and purporting to authenticate a copy of the forged Cover Letter.  These statements were false and misleading.  Shekhter knew the forged Cover Letter was not authentic because he fabricated it.  On or about September 28, 2015, Miller and Zelig, acting on behalf of Shekhter, NMS Capital, and the other Lincoln Studios Plaintiffs, caused the perjurious declaration to be mailed through the U.S. Postal Service to Gibson Dunn and, on information and belief, to counsel for other defendants in the Lincoln Studios Litigation.

t.  On or about September 17, 2015, Shekhter, Margot Shekhter, and NMS Capital verified supplemental interrogatory responses in the Lincoln Studios Litigation ("Responses").  On or about September 17, 2015, Zelig, acting on behalf of Shekhter, Margot Shekhter, and NMS Capital, caused the Responses to be sent by email from Zelig to Gibson Dunn.  On or about October 1, 2015, Zelig caused the Responses to be sent by U.S. Mail to Gibson Dunn.  The Responses further rely upon the forged "Version 2," despite the fact that Shekhter created the forgery and after having repeatedly been put on notice of its fabrication.  In fact, Shekhter, Margot Shekhter, and NMS Capital purport to attach "a true and correct copy of Version 2" as an exhibit to the Responses.

u.  On or about February 23, 2016, Shekhter submitted yet another perjurious declaration in the Lincoln Studios Litigation.  Specifically, in Paragraph 26 of the declaration, Shekhter stated:  "Once I received the full version of

the JVA, I saw that Section 11 granted a 'Buy/Sell' right five years after formation of the Joint Venture, as opposed to three years to which we agreed.  I spoke with Mr. Samek on or shortly before September 14, 2010 and brought the error to Mr. Samek's attention.  He acknowledged that the provision was inaccurate and said he would fix it by changing Section 11's Buy/Sell from a 5-year term to a 3-year term."  In Paragraph 28, Shekhter stated: "Mr. Samek fixed the mistake in 'Version 1' and sent me 'Version 2' of the JVA . . . ."  Shekhter attached the forged "Version 2" to his February 23, 2016 declaration.  Shekhter knew these statements were false and misleading because he forged "Version 2" in July 2013.  On or about February 23, 2016, Miller and Zelig, acting on behalf of Shekhter, NMS Capital, and the other Lincoln Studios Plaintiffs, caused the perjurious declaration to be sent via overnight delivery to Gibson Dunn.

v.   On or about March 16, 2016, Miller, on behalf of Neil Shekhter, NMS Properties, and NMS Capital, sent a letter via email and certified mail through the U.S. Postal Service to representatives of PwC, AEW CM and AEW P6's auditor, and Goodwin, the Joint Venture and Subsidiary Companies' tax preparer, both located in the State of Massachusetts, attaching a copy of the TAC in the sham Lincoln Studios Litigation.  In the letter, Miller represented to PwC and Goodwin that the knowingly false and misleading "information" in the TAC "is critical to your audit," and "should be reflected in PwC's audit and in Goodwin's financial and tax reporting."  Defendants knew these statements were misleading because they knew "Version 2" was a forgery and fabrication, and therefore was not "critical" to any audit and should not have been "reflected" in any audit or financial and tax reporting.

w.   On or about March 28, 2016, Miller, on behalf of Neil Shekhter, NMS Properties, and NMS Capital, sent a letter via email and certified mail

through the U.S. Postal Service to representatives of various Joint Venture lenders, Comerica Bank, KeyBank, Berkadia Commercial Mortgage LLC (located in Virginia), PNC Bank, NA, and PNC Real Estate.  In the letter, Miller falsely represented that Neil Shekhter "did not forge anything" and that "Samek . . . created [Version 2] and sent it to Mr. Shekhter"—statements that Defendants knew to be false because they knew "Version 2" was a forgery.

x.  On or about June 2, 2016, Miller, on behalf of Neil Shekhter, NMS Properties, and NMS Capital, sent a letter via email and certified mail through the U.S. Postal Service to representatives of the Listing Agent.  In the letter, Miller falsely represented that "AEW has no right, or authority, to engage you and your company to market this portfolio," and threatened to "hold [the Listing Agent and its representatives] responsible and liable for interference . . . , exposing you to in excess of $500 million in damages."  Miller also demanded that the Listing Agent "inform any prospective purchasers about," *inter alia*, the sham Lincoln Studios Litigation and "NMS' claims" therein.  Defendants knew these statements were false and misleading because they knew the sham Lincoln Studios Litigation and NMS' claims therein were predicated on a forgery.

y.  On or about June 24, 2016, Shekhter sent the Investor Member, AEW CM, and DLA a purported "Buy/Sell Offer Notice Pursuant to Section 11 of the JVA, dated September 8, 2010" (the "Alleged Notice").  In the Alleged Notice, Shekhter, on behalf of NMS Capital, purported to "provide[] notice of [its] exercise of its Buy/Sell offer in the amount of US $500 million" "[p]ursuant to Section 11.1" of the JVA.  This Alleged Notice was sent by email and certified mail through the U.S. Postal Service to the Investor Member in Massachusetts, AEW CM, and the former attorneys for the Investor Member, also located in Massachusetts.

1    The Alleged Notice was sent in furtherance of the fraudulent scheme,

2    designed to thwart a potential sale.

3    z.  On or about June 29, 2016, Miller, on behalf of NMS Properties and NMS

4        Capital, sent a letter via email and certified mail through the U.S. Postal

5        Service to three representatives of Invesco, Potential Buyer No. 1,

6        attaching a copy of Defendants' knowingly false and misleading

7        complaint in the sham Lincoln Studios Litigation.  Two of the

8        representatives are located in Georgia.  Miller also sent a copy to a

9        representative of Gibson Dunn, a representative of AEW CM, and an

10       attorney for the Listing Agent in New York.  In the letter, Miller falsely

11       represented that "AEW has no right to sell, transfer, assign, hypothecate

12       or otherwise encumber all or any part of the JV Properties," and that

13       "AEW's interest in the Joint Venture [is] zero."  In addition, Miller

14       misleadingly described the TAC as the "operative complaint," and

15       purported to put Potential Buyer No. 1 on notice that his clients will hold

16       it "responsible for interference and conspiracy, exposing your

17       organization[] to over $500 million in damages," if it does not

18       "immediately cease and desist from interfering with the contractual rights

19       of our clients by attempting to purchase the JV Portfolio."

20   aa. On or about June 29, 2016, Miller, on behalf of NMS Capital and NMS

21       Properties, sent another letter via email and certified mail through the U.S.

22       Postal Service to representatives of First American Title Insurance

23       Company, Fidelity National Financial in Florida, Stewart Title Insurance

24       Guaranty in Texas, Old Republic Insurance Company, North American

25       Title Insurance Company, Chicago Title Insurance Company, Investors

26       Title Company in Illinois, Land America Financial Group, Attorney's

27       Title Insurance Funds, Inc. in North Carolina, Lawyer's Title Insurance

28       Corporation in Nebraska, Westcor Land Title Company, Ticor Title,

1    United General Title Insurance Company, and Commonwealth Land Title

2    Insurance Company, which together constituted most if not all of the

3    major title insurance companies in the United States, attaching a copy of

4    Defendants' knowingly false and misleading complaint in the sham

5    Lincoln Studios Litigation.  Miller also sent a copy to an attorney for the

6    Listing Agent located in New York.  In the letter, Miller falsely

7    represented that "AEW has no right to sell, transfer, assign, hypothecate

8    or otherwise encumber all or any part of the JV Properties," and that

9    "AEW's interest in the Joint Venture [is] zero."  In addition, Miller

10   misleadingly described the TAC as the "operative complaint," and

11   purported to put the Prospective Title Insurers on notice that "NMS will

12   hold [them and their representatives] responsible and liable for . . .

13   potentially hundreds of millions in compensatory and punitive damages"

14   if they "provide title insurance for, facilitate, or in any way participate in

15   the sale of the JV Properties."

16   bb. On or about June 30, 2016, Miller, on behalf of NMS Capital and NMS

17   Properties, sent a letter via email and certified mail through the U.S.

18   Postal Service to representatives of Douglas Emmett, another potential

19   buyer of the Joint Venture's portfolio of Properties ("Potential Buyer No.

20   2"), attaching a copy of Defendants' knowingly false and misleading

21   complaint in the sham Lincoln Studios Litigation.  Miller also sent a copy

22   to an attorney for the Listing Agent located in New York.  In the letter,

23   Miller falsely stated that "AEW has no right to sell, transfer, assign,

24   hypothecate or otherwise encumber all or any part of the JV Properties."

25   In addition, Miller misleadingly described the TAC as the "operative

26   complaint," and purported to put Potential Buyer No. 2 on notice that it

27   "could face legal exposure and liability to our clients for hundreds of

28   millions of dollars in compensatory and punitive damages for interfering

1    with our clients' contractual rights and prospective economic benefit," if

2    it "continues its efforts to purchase the JV Properties."

3    cc. On or about June 30, 2016, Miller, on behalf of Neil Shekhter, NMS

4    Properties, and NMS Capital, also sent a letter via email and certified mail

5    through the U.S. Postal Service to three executives with Equity

6    Residential ("Potential Buyer No. 3"), another potential buyer of the Joint

7    Venture's portfolio of properties, attaching a copy of Defendants'

8    knowingly false and misleading complaint in the sham Lincoln Studios

9    Litigation.  Miller also sent a copy to an attorney for the Listing Agent

10   located in New York.  In the letter, Miller falsely stated that "AEW has no

11   right to sell, transfer, assign, hypothecate or otherwise encumber all or

12   any part of the JV Properties," and purported to put Potential Buyer No. 3

13   and its executives on "notice that you and your company could face legal

14   exposure and liability to our clients for hundreds of millions of dollars in

15   compensatory and punitive damages for interfering with our clients'

16   contractual rights and prospective economic benefit."  Miller further

17   warned that "if Equity Residential continues its efforts to purchase the JV

18   Properties, our clients will hold Equity Residential responsible for this

19   interference, exposing you and your company to over $500 million in

20   damages."

21   dd. On or about July 26, 2016, Miller, on behalf of NMS Properties, NMS

22   Capital, and Neil Shekhter, sent a letter via email and overnight mail

23   through Federal Express to representatives of KeyBank in Colorado and

24   Utah, attaching a copy of the knowingly false TAC in the sham Lincoln

25   Studios Litigation.  In the letter, Miller disputed that "the extensions of

26   the Loans" were being done to facilitate the sale of the Properties, falsely

27   stating that "AEW has no right to sell, transfer, assign, hypothecate or

28   otherwise encumber all or any part of the JV Properties," and warning that

1            NMS "will sue any prospective purchaser that interferes with NMS' rights

2            to purchase the Properties."

3      ee. On or about November 23, 2016, NMS Properties sent a letter to the

4            tenants of the Joint Venture Properties by First Class mail through the

5            U.S. Postal Service and, upon information and belief, by email, telling the

6            tenants that the Joint Venture Properties had not been sold and that all rent

7            should continue to be paid to NMS Properties.  Specifically, the letter

8            misrepresented that:  "We are writing to confirm that there has been no

9            change in Landlord or obligations to Landlord as per your current lease

10           agreement.  Additionally, NMS Properties, Inc. remains the property

11           manager servicing your property."  NMS Properties knew these

12           statements were false and misleading because the Joint Venture Properties

13           had been sold and because NMS Properties had been terminated.

14     199.   Each use of the mails or wires in furtherance of the fraudulent scheme

15 constitutes a separate act of mail or wire fraud and thus a predicate act for purposes of

16 RICO.

17     200.   Shekhter participated in the scheme or artifice to defraud knowingly,

18 willfully, and with the specific intent to deceive and/or defraud Plaintiffs into

19 conveying their Joint Venture membership interests to and paying money to

20 Defendants.  Shekhter knowingly and intentionally forged and fabricated "Version 2"

21 of the JVA, the La Cienega PMA, and the Cover Letter, knowingly and intentionally

22 disseminated the forgeries to courts and third parties, and knowingly and intentionally

23 disseminated false and misleading representations regarding the forgeries and the

24 operative JVA and Plaintiffs' rights thereunder with the intent that Plaintiffs would

25 rely on them to their detriment.  Shekhter knowingly engaged in the aforementioned

26 conduct with the intent to generate fear in Plaintiffs such that Plaintiffs would

27 ultimately be forced to convey their Properties and pay money to Defendants.

28

Gibson, Dunn &
Crutcher LLP

### 3.   Bank Fraud in Violation of 18 U.S.C. § 1344

201.   As described herein, as part of the scheme or artifice to defraud, Neil Shekhter emailed the forged "Version 2" JVA, and made false and misleading representations regarding the forged JVA, to representatives of KeyBank with the specific intent that it would rely on the forged "Version 2" JVA and Shekhter's false and misleading representations regarding the forged JVA to its detriment and/or Plaintiffs' detriment, for the purpose of obtaining financing from KeyBank. Specifically:

a.   On July 18, 2013, just three days after forging "Version 2," Shekhter emailed a copy of the forged "Version 2" to Andrew Lucca, in Arizona, and James Prouty of KeyBank, the federally insured lender for one of the Joint Venture's Properties.  In the email, Shekhter falsely represented that the forgery "is the version that I have executed in September 2010."  Of course, Shekhter knew the document attached to his email ("P6 LA MF Holdings I LLC 2 v.2.pdf") was a forgery and not what he executed in September 2010 because he and his son Adam had forged "Version 2" only days earlier.

b.   On or about March 28, 2016, Miller, on behalf of Shekhter, NMS Properties, and NMS Capital, sent a letter via email and certified mail through the U.S. Postal Service to representatives of KeyBank as well as other third-party lenders, falsely representing that Neil Shekhter "did not forge anything" and that "Samek . . . created [Version 2] and sent it to Mr. Shekhter"—statements that Defendants knew to be false.

c.   On or about July 18, 2016, Samek of AEW sent a letter to KeyBank, asking that the bank extend the maturity dates of three loans relating to the Joint Venture's Properties at 1420 5th Street, 9901 Washington Boulevard, and 1430 5th Street, in order to facilitate the sale of those Properties.  Shortly thereafter, on or about July 26, 2016, Miller, on behalf

1    of NMS Properties, NMS Capital, and Neil Shekhter, sent a letter via
2    email and overnight mail through Federal Express to representatives of
3    KeyBank in Colorado and Utah, attaching a copy of the knowingly false
4    TAC in the sham Lincoln Studios Litigation.  In the letter, Miller disputed
5    that "the extensions of the Loans" were being done to facilitate the sale of
6    the Properties, falsely stating that "AEW has no right to sell, transfer,
7    assign, hypothecate or otherwise encumber all or any part of the JV
8    Properties," and warning that NMS "will sue any prospective purchaser
9    that interferes with NMS' rights to purchase the Properties."

10    202.   Upon information and belief, KeyBank is a financial institution as that
11    term is defined by 18 U.S.C. § 20.

12    203.   Accordingly, Shekhter has knowingly executed, or attempted to execute, a
13    scheme or artifice to defraud a financial institution or to obtain moneys, funds, credits,
14    assets, securities, or other property owned by, or under the custody or control of, a
15    financial institution, in violation of 18 U.S.C. § 1344.

16    204.   Plaintiffs have been and will continue to be injured in their business and
17    property by reason of Shekhter's violations of 18 U.S.C. § 1962(c), in an amount to be
18    determined at trial.  The injuries to Plaintiffs directly, proximately, and reasonably
19    foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(c)
20    include, but are not limited to, the lost profits that Plaintiffs incurred as a result of the
21    impairment and diminution in the purchase price of the Properties caused by
22    Defendants' false and misleading statements, the default fees and interest that Plaintiffs
23    incurred as a result of the default caused by Defendants' false and misleading
24    statements, and the attorneys' fees and costs that Plaintiffs incurred in responding to
25    Defendants' extortionate threats and fraudulent misrepresentations and omissions.

26    205.   Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble
27    damages plus attorneys' fees and costs from Shekhter.

28    206.   WHEREFORE, Plaintiffs pray for judgment as set forth below.

**SECOND CLAIM FOR RELIEF**

**(Conspiracy to Violate RICO, Violation of 18 U.S.C. § 1962(d))**

**(All Plaintiffs As Against Defendants Neil Shekhter, Margot Shekhter, NMS Properties, and NMS Capital)**

207.   Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

208.   Defendants have unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

209.   Upon information and belief, Defendants knew that they were engaged in a conspiracy to commit the predicate acts, and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity.  This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

210.   Upon information and belief, Defendants agreed to conduct or participate, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

211.   Each Defendant knew about and agreed to facilitate the Enterprise's scheme to obtain money or property from Plaintiffs.  It was part of the conspiracy that Defendants and their Co-Conspirators would commit a pattern of racketeering activity in the conduct of the affairs of the Enterprise, including the acts of racketeering set forth in paragraphs 189-204, *supra*.

212.   As a direct and proximate result of Defendants' conspiracy, the acts of racketeering activity of the Enterprise, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have suffered significant injuries including, but not limited to:  millions of dollars spent defending against Defendants' extortionate threats, fraudulent misrepresentations and omissions, and

frivolous lawsuits; millions of dollars spent mitigating the business impact of Defendants' pervasive misconduct, such as default interest on loans which Defendant caused the default of; tens of millions of dollars in lost sale proceeds for the Joint Venture assets; and harm to their reputation and business interests as a result of the continuous frivolous litigation and Defendants' many misleading and fraudulent communications to third-party lenders, auditors, property managers, title insurance companies, investors, potential buyers and countless others.

213.   Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages plus attorneys' fees and costs from Defendants.

214.   WHEREFORE, Plaintiffs pray for judgment as set forth below.

## THIRD CLAIM FOR RELIEF

### (Breach of Contract)

### (AEW As Against Defendants Neil Shekhter and Margot Shekhter, Individually And As Trustees Of The NMS Family Living Trust dated September 3, 1991)

215.   Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

216.   On or about September 8, 2010, Neil Shekhter, individually and on behalf of the Trust, and Margot Shekhter, on behalf of the Trust, executed the Undertaking.

217.   As part of the Undertaking, Neil Shekhter (the "Principal") and the Trust (the "Trust" and, collectively with Neil Shekhter, the "Principals") agreed to indemnify, defend and hold the Joint Venture and the Investor Member harmless from and against any liability, loss, cost (including reasonable attorneys' fees) or damages arising from:

(a) any fraud, willful misconduct, gross negligence or any intentional misrepresentation of any material fact (including, but not limited to, the representations and warranties set forth on Schedule 2.3(a) to the LLC Agreement) by Operating Member or any Person controlling, controlled by or under common control with Operating Member (any such Person, a "Controlled Affiliate") in connection with the LLC Agreement, the Company, a Subsidiary Company or with respect to any Property;

(b) any misappropriation or embezzlement of funds of the Company or any Property by Operating Member or any of its Controlled Affiliates;
(c) any act of intentional damage, arson or intentional physical waste of or to the Property by Operating Member or any of its Controlled Affiliates;
(d) actions taken, or omitted to be taken, with respect to the Company or the Property in bad faith on the part of Operating Member or any of its Controlled Affiliates;
(e) Operating Member, the Property Manager or the Developer Manager (as long as they are an Affiliate of Operating Member), a Principals, the Approved Substitute Principal or any of their respective Affiliates or Related Parties: (1) bringing or participating in, or acting in concert with others to bring, any voluntary or involuntary bankruptcy, liquidation, receivership or similar proceeding against the Subsidiary Company or the Company or any Member; (2) being listed as a petitioning creditor in any such proceeding; or (3) soliciting or causing to be solicited petitioning creditors for any such proceeding; and/or
(f) any Transfer of Operating Member's interest in the Company or of the Principals' indirect interest in the Company, in either case, in violation of the LLC Agreement.

218.   Defendants Neil Shekhter and NMS Properties are "Controlled Affiliates" within the meaning of Paragraph 1 of the Undertaking.

219.   Paragraph 7 of the Undertaking states that "[t]he Principals shall pay to Investor Member within ten (10) days after demand any and all actual and reasonable expenses, losses, costs or damages paid or incurred by Investor Member, including reasonable attorneys' fees and disbursements, as a result of a breach by the Principals of an obligation under this letter, together with interest at 12% per annum, but in no event at a rate which exceeds the highest rate permitted by applicable law, on any amounts owing under this letter from the date paid or incurred by Investor Member until paid by the Principals."

220.   As described herein, NMS Capital and its "Controlled Affiliates" engaged in substantial misconduct constituting fraud, willful misconduct, gross negligence, intentional misrepresentation of material fact, misappropriation or embezzlement of Joint Venture funds, and acts or omissions in bad faith.  NMS Capital and its "Controlled Affiliates" also brought, are still bringing, or participated in bringing proceedings seeking the destruction of the Joint Venture.  These acts have caused liabilities, losses, costs, and damages to AEW.

221.   On January 13, 2017, pursuant to and in compliance with Paragraph 7 of the Undertaking, the Investor Member issued a demand letter (the "Undertaking Demand") demanding reimbursement of the actual and reasonable liability, expenses, loses, costs or damages paid or incurred by the Investor Member and arising from the fraud, willful misconduct, gross negligence, intentional misrepresentation of material fact, misappropriation or embezzlement, and acts taken or omitted to be taken in bad faith by the Operating Member and its Controlled Affiliates.  The Undertaking Demand required the Principals to reimburse the Investor Member for tens of millions of dollars in damages, costs, fees, and liabilities incurred by the Investor Member in the form of attorneys' fees and costs, witness fees and costs, fees and expenses reimbursed by the Investor Member to others, default interest on Joint Venture loans, payroll expenses, management fees, and rent monies.

222.   The letter required the Principals to pay $17,984,912 in fees, costs, damages, and liabilities already incurred and/or paid to date by the Investor Member within 10 days of the Undertaking Demand and reserved the Investor Member's right to issue further demands as additional amounts are incurred.  A true and correct copy of the January 13, 2017 Undertaking Demand is attached hereto as **Exhibit 6**.

223.   To date, as of January 23, 2017, more than 10 days after the issuance of the Undertaking Demand, the Principals have not complied with the Undertaking Demand, and have not provided the required indemnification.

224.   The Principals' failure to provide the required indemnification constitutes a material breach of their obligations under the Undertaking.

225.   As a direct and foreseeable result of the Principals' breach of their obligations under the Undertaking, AEW has suffered damages to which it is entitled, plus interest at a rate of 12% per annum.

226.   WHEREFORE, Plaintiffs pray for judgment as set forth below.

## FOURTH CLAIM FOR RELIEF

### (Tortious Interference with Prospective Economic Advantage)

### (All Plaintiffs As Against Defendants Neil Shekhter, NMS Properties and NMS Capital)

227. Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

228. Defendants NMS Properties and NMS Capital were aware of Plaintiffs' prospective economic relationships with one or more of the Prospective Title Insurers.

229. Defendants NMS Properties and NMS Capital were aware of Plaintiffs' prospective economic relationships with one or more of the prospective lenders.

230. Defendants NMS Properties and NMS Capital were aware of Plaintiffs' prospective economic relationships with one or more of the Potential Buyers.

231. Defendants NMS Properties and NMS Capital intentionally caused the Prospective Title Insurers, the prospective lenders, and the Potential Buyers to terminate their prospective economic relationship with Plaintiffs.  Defendants Neil Shekhter, NMS Properties and NMS Capital, through independently wrongful conduct consisting of, *inter alia*, false, misleading, and defamatory statements and omissions, induced the Prospective Title Insurers, the prospective lenders, and certain Potential Buyers not to consummate any economic relationships with Plaintiffs.

232. As a direct, proximate, and foreseeable result of this independently wrongful conduct, Plaintiffs lost the benefits of their potential relationships with the Prospective Title Insurers, prospective lenders, and certain Potential Buyers, causing millions of dollars in damages to Plaintiffs.

233. Defendants Neil Shekhter, NMS Properties and NMS Capital have engaged in malicious, willful, and fraudulent conduct in the commission of these independently wrongful acts, and because of the reprehensible nature of these acts, Plaintiffs are entitled to, and should be awarded, punitive damages against them.

234. WHEREFORE, Plaintiffs pray for judgment as set forth below.

## FIFTH CLAIM FOR RELIEF

### (Conversion)

### (Joint Venture and The Subsidiary Companies As Against Defendant NMS Properties)

235.    Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

236.    Plaintiffs are the rightful owners and possessors of the Joint Venture's funds, including the rents derived from each of the Properties.

237.    Plaintiffs are the rightful owners and possessors of the records pertaining to each of the Properties.

238.    Defendant NMS Properties intentionally and substantially interfered with Plaintiffs' property by taking possession of the rents derived from each of the Properties, preventing Plaintiffs from having access to those rents, and/or refusing to transfer them to Plaintiffs after Plaintiffs demanded their transfer; and by refusing to render the records pertaining to each Property to Plaintiffs.

239.    Plaintiffs did not consent to Defendant NMS Properties' conduct.

240.    Plaintiffs were harmed by Defendant's conduct.

241.    Defendants' conduct was a substantial factor in causing Plaintiffs' harm.

242.    WHEREFORE, Plaintiffs pray for judgment as set forth below.

## SIXTH CLAIM FOR RELIEF

### (Slander of Title)

### (The Subsidiary Companies As Against Defendants Neil Shekhter, NMS Properties and NMS Capital)

243.    Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

244.    Defendants Neil Shekhter, NMS Properties, and NMS Capital published statements that cast doubt upon and disparaging the Subsidiary Companies' ownership of the Properties, including statements to potential buyers and at least fourteen major

title insurance companies in the United States asserting that the Subsidiary Companies had no right to sell the Properties and that the Subsidiary Companies' agent, AEW, had no right to market the Properties for sale on their behalf.

245.   The Subsidiary Companies did in fact own the Properties, and did in fact have the right to market the Properties for sale, using AEW as their agent.  Defendants' statements were therefore false.

246.   Defendants knew their statements to be untrue, and/or acted with reckless disregard with respect to the truth or falsity as to whether their statements were true.

247.   Defendants' publication of the false and slanderous statements was not privileged.

248.   Defendants recognized that others would act in reliance on their false statements, causing the Subsidiary Companies' financial loss.

249.   The Subsidiary Companies did in fact suffer immediate and direct pecuniary loss, including in the form of the diminished purchase price for the Properties and the attorneys' fees and costs reasonably and necessarily incurred in the sham Lincoln Studios Litigation to remove the doubt cast upon the vendibility of the Properties.

250.   Defendants' conduct was a substantial factor in causing the Subsidiary Companies harm.

251.   WHEREFORE, Plaintiffs pray for judgment as set forth below.

## PRAYER FOR RELIEF

**On the First and Second Claims for Relief:**

1.   For general damages according to proof at trial, trebled according to statute, 18 U.S.C. § 1964(c);

2.   For pre-judgment interest according to statute; and

3.   For Plaintiffs' reasonable attorney's fees and costs according to statute, 18 U.S.C. § 1964(c).

Gibson, Dunn & Crutcher LLP

**On the Third Claim for Relief:**

1.    For general damages according to proof at trial; and

2.    For interest at a rate of 12% per annum.

**On the Fourth Claim for Relief:**

1.    For general damages according to proof at trial; and

2.    For punitive damages in an amount to be proven at trial.

**On the Fifth Claim for Relief:**

1.    For general damages according to proof at trial; and

2.    For punitive damages in an amount to be proven at trial.

**On the Sixth Claim for Relief:**

1.    For general damages according to proof at trial; and

2.    For punitive damages in an amount to be proven at trial.


Dated:  January 25, 2017                 GIBSON, DUNN & CRUTCHER LLP


By: _____/s/ James P. Fogelman____
         James P. Fogelman

Attorneys for Plaintiffs
P6 LA MF Holdings SPE, LLC, P6 LA MF
Holdings I LLC, Luxe Broadway, LLC, Luxe La
Cienega, LLC, Luxe Washington, LLC, 1410
5th Street, LLC, Luxe 1420 5, LLC, Luxe 1440
5, LLC, NMS Broadway, L.P., and Lincoln
Walk Studios, LP